No. 29,355.

Sarah E. Wigington, *Appellee*, v. The Mid-Continent Royalty Company, Fulton Graham, as President, and Earl A. Cline, as Secretary, etc., *Appellants*.

(288 Pac. 749.)

Opinion filed June 7, 1930.

*William S. Cline* and *William H. Cline,* both of Newkirk, Okla., for the appellants.

*W. L. Cunningham, D. Arthur Walker, Fred G. Leach* and *William E. Cunningham,* all of Arkansas City, for the appellee.

The opinion of the court was delivered by

Jochems, J.: Plaintiff brought this action to cancel a certain oil-and-gas royalty conveyance on eighty acres of land and to quiet her title to the land. Judgment was rendered for plaintiff, and defendants appeal.

The case was submitted to the court upon the petition of the plaintiff and the exhibits attached thereto, the answer of the defendants, reply of plaintiff, the trust agreement under which the defendant company was organized, and a statement showing a list of the royalties owned by the defendant company which have

been acquired by giving in exchange therefor units of ownership in the royalty company. No evidence other than the foregoing was introduced.

The petition of the plaintiff, after alleging that the defendant company was a common-law trust, that defendants Graham and Cline were the president and secretary thereof, respectively, and the address of the defendants at Newkirk, Okla., alleged further that the defendant company had ever since August 17, 1925, been exercising or purporting to exercise corporate powers in the state of Kansas and selling and disposing of units or shares of the defendant company; that the company never at any time had any authority to exercise corporate powers and never had any authority from the Kansas blue-sky board to sell or dispose of units, interests or shares; that the plaintiff is the owner of eighty acres of land (describing), and that in February, 1926, the defendants Graham and Cline came to plaintiff's residence on the lands described in her petition and proposed that she give to the company a royalty pooling agreement and royalty conveyance, conveying to the Mid-Continent Royalty Company, its successors and assigns, an undivided one-half interest in and to the oil-and-gas royalty, exclusive of oil-and-gas lease bonuses and rental moneys on the lands; that they represented to her that the contract and royalty conveyance would be for a term of twenty years and no longer; that the company owned other royalty contracts upon lands on which drilling operations were being conducted, and that within a few months she would be drawing large dividends from the units in the company. The plaintiff alleged that she was illiterate and that defendants knew she could neither read nor write; that defendants further represented to her that the company was duly authorized to transact business in the state of Kansas and that its method of doing business had been submitted to and approved by the blue-sky board of Kansas; that the company had been duly authorized to issue units or shares therein and that in consideration of the foregoing the plaintiff entered into a royalty pooling agreement and made a royalty conveyance in return for a certificate of 2,240 units in the defendant company; that thereafter, on about June 10, 1927, she learned that the royalty pooling agreement and conveyance covering her real estate provided for a term of not only twenty-one years, but for as long as oil and gas were thereafter produced in paying quantities. She learned, also, that the company was not a corpora-

tion and had no authority to do business in the state of Kansas; that the company is what is known as a common-law trust under which all unit holders are individually liable for the debts of the company, and learned further that the company had never obtained permission from the blue-sky board of Kansas to sell its units or interests. She learned, also, that the company had no production on any acreage owned by it and no drilling wells on any of its acreage; that immediately upon learning such facts she demanded a reconveyance to her of the royalty and offered to return the units which she had received, and in her petition tendered the units into court. Attached to plaintiff's petition as exhibit A was a copy of the certificate for the 2,240 units of the capital of the defendant company; also attached as exhibit B was the contract and royalty agreement. This was dated February ——, 1926, and was made between the Mid-Continent Royalty Company, parties of the first part, and Sarah E. Wigington, party of the second part. Exhibit C, attached to the petition, was a copy of the royalty conveyance, which was dated November 14, 1925, and conveyed to the defendant company, its successors and assigns, an undivided one-half interest in and to the oil and gas royalties, exclusive of lease bonuses or rental money on the eighty acres of land described in the conveyance. This conveyance recited that the party of the first part "in consideration of the sum of one dollar and other valuable considerations, receipt of which is hereby acknowledged, does hereby bargain, sell, grant, convey, transfer, assign and set over to the said second party" the interest above described. The term was specified "for a term of twenty-one years and as long thereafter as oil and gas or either of them is produced in paying quantities on any of the acreages in the block belonging to the Mid-Continent Royalty Company." It provided further that the first party should receive all oil and gas bonuses and rentals other than the royalty conveyed, and that in leasing the land the second party should not be a necessary party to the lease. The conveyance also contained a warranty of title on the part of the first party.

In their answer the defendants pleaded a general denial; admitted that the company was a common-law trust, that the defendant Graham was the president and the defendant Cline was the secretary of the company; that the company did pool an undivided one-half interest in the oil-and-gas royalty in the land described in plaintiff's petition and gave the plaintiff 2,240 units in the com-

pany in return for the pooling of the royalty; that the royalty conveyance was duly recorded in Cowley county. Defendants denied that there was any fraud or misrepresentation and alleged that plaintiff fully understood the terms of the royalty. They further denied that the "pooling of royalty" in the defendant company and the giving of units in return for the "pooling" come under the blue-sky law of the state of Kansas, and denied that defendants had violated the blue-sky law of Kansas by engaging in the sale of units in the defendant company. To this answer the plaintiff filed a reply, which is a general denial.

On June 13, 1929, the case came on for trial before the court and was taken under advisement to allow plaintiff and the defendants time to file written briefs. At the trial, in addition to the pleadings and exhibits hereinbefore referred to, there was introduced in evidence a copy of the trust agreement under which the Mid-Continent Royalty Company was organized. This trust agreement was drawn in the manner and form of what is generally referred to as a "common law" or "Massachusetts trust." It provided, in part, that the parties Graham and Cline entered into an agreement between them and together with their assigns and successors under which they became the trustees of the trust and had the full right and power to manage and control the same; it further provided that the pool should consist of royalties equivalent to an undivided one-half royalty interest in 50,000 acres of land, and there should be issued in the aggregate for such interests on the 50,000 acres of land two million units to the persons conveying their royalty interests. It further provided a method by which some bank or banks should be appointed as custodians for all funds received as royalties from the interests in oil-and-gas lands belonging to the pool, and that from time to time the banks should distribute to the unit holders their *pro rata* share of the income from the pool. It provided, also, that of the two million units to be issued, seventy per cent was to be issued to the owners of the lands on which the royalty interests were acquired and thirty per cent of the units was "to go to the trustees for the uniting of the fee holders, and it is further agreed that the trustees are to pay all the expenses of uniting the fee holders of the 50,000 acres." The trust agreement contained further conditions relative to the powers of the trustees to select officers, to fill vacancies on the board of trustees and other details commonly found in such trust agreements.

At the trial there was submitted in evidence a complete list of the royalty conveyances procured before November 14, 1925, the date upon which Sarah Wigington made her conveyance. This list showed the names of owners of the lands, described the lands and gave the amount of royalty interest conveyed. The lands were located principally in Kay county, Oklahoma, and Cowley county, Kansas.

Thereafter, on June 24, 1929, the plaintiff filed a motion asking for the allowance of a reasonable attorney's fee and set up in her motion that in order to obtain cancellation of the royalty conveyance it was necessary for her to employ an attorney and that defendants refused to cancel the conveyance and clear her land of encumbrance.

Upon the foregoing the court rendered judgment. In the journal entry of judgment the court made certain findings of fact in which the court found that the defendant company·was a common-law trust existing under a written declaration of trust, a copy of which was introduced in evidence; that the company had never at any time applied to the blue-sky board for permission to do business in Kansas, or to sell or dispose of its units of interest in Kansas; that no permit had ever been applied for and none was ever issued; that it had no authority from the state of Kansas to exercise corporate powers within the state; that the transaction by which the defendant company obtained the conveyance from the plaintiff came within the provisions of the blue-sky law of Kansas, and that the defendant company having no permit or authority from the blue-sky board to sell its units, the transaction was in violation of the blue-sky law of the state of Kansas and was, and is, absolutely null and void. The court concluded that the royalty conveyance should be canceled and that the units issued to the plaintiff should be canceled and held for naught; it further allowed an attorneys' fee of $250 to plaintiff's attorneys.

The appellants urge that the trial court erred in finding that the blue-sky law of Kansas applied to the transaction; that the court erred in quieting title to plaintiff's land when plaintiff failed to deliver into court the certificate for 2,240 units in the defendant company, and that the court further erred in allowing plaintiff an attorneys' fee.

Does the blue-sky law of Kansas (R. S. 17-1201 to 17-1222, inclusive) apply to the transaction shown in this case?

Appellants urge that inasmuch as they were engaged in forming a pool whereby they took the royalty conveyance from the plaintiff and gave her in exchange therefor the certificate for 2,240 units, this did not constitute a sale within the meaning of the blue-sky law. Appellants admit that the blue-sky law does apply to the sale of securities or shares of a common-law trust the same as to the stock of a corporation, and that this has been so decided by this court in *Lumber Co. v. State Charter Board,* 107 Kan. 153, 190 Pac. 601. The appellants, after setting forth the statute which relates to the sale of speculative securities in the state of Kansas (R. S. 17-1202), urge that the statute by its terms applies only to a "sale" or "offer for sale." Appellants further contend that the statute is penal in its nature; that it must be strictly construed; that the legislature has the power to enlarge the scope of the criminal statutes, but the court has no power to do so. The appellants then cite some authorities on the definition of the word "sale."

Appellants have correctly stated the general rule relative to the construction of penal statutes. However, as is generally the case, we find that there are exceptions to the rule. In 25 R. C. L. § 302, p. 1084, the law is stated:

"The rule of strict construction of a penal law is subordinate to the rule of reasonable, sensible construction, having in view effectuation of the legislative purpose, and is not to be so unreasonably applied as to defeat the true intent and meaning of the enactment. While criminal statutes are to be strictly construed in favor of the defendant, the courts are not authorized so to interpret them as to defeat the obvious purpose of the legislature or so to narrow the words of the statute as to exclude cases which those words in their ordinary acceptation would include. Courts are to take a common-sense view of the statute as a whole, and if by so doing and giving to the words used a reasonable construction the object of the legislature can be definitely ascertained and carried out, the statute must be upheld; if not, it must fall. The rule that a penal statute must be strictly construed does not prevent the courts from calling to their aid all the other rules of construction and giving each its appropriate scope, and is not violated by giving the words of the statute a reasonable meaning according to the sense in which they were intended, and disregarding captious objections and even the demands of exact grammatical propriety. When the purpose of the law is manifest, strict construction does not militate against any departure from the primary meaning of words within the reasonable scope thereof. Greater latitude is exercised by the courts in the construction of statutes defining misdemeanors to prevent frauds than those which have to do with graver offenses and more immediately affect individuals than the general public. . . ."

The law in question was adopted by the Kansas legislature in

1915, and is chapter 164 of the Laws of 1915, as subsequently amended in 1919. The title of the act reads:

"An act to prevent unfairness, imposition or fraud in the sale or disposition of certain 'securities' herein defined by requiring an inspection thereof, providing for such inspection, supervision and regulation of the business of any person, association, partnership or corporation, engaged or intending to engage, whether as principal, broker or agent, in the sale of any such securities in the state of Kansas, as may be necessary to prevent unfairness, imposition or fraud in the sale or disposition of said securities and providing penalties for the violation thereof. . . ."

The legislative purpose is made clear by the title of the act. The object which the legislature had in mind was to prevent unfairness or fraud in the *sale or disposition* of securities. No contention is here made that the securities of the defendant were not within the definitions of the term "securities" as defined in the act.

In *White v. Kansas City,* 102 Kan. 495, 170 Pac. 809, this court in considering the question of statutory construction said:

"By a separate section a violation of the provisions of the section already referred to is made a misdemeanor. (Gen. Stat. 1915, sec. 8801.) It is argued that the statute being penal should be strictly construed. Notwithstanding the penalty, the purpose of interpretation is to arrive at the real intention of the legislature (36 Cyc. 1183-1185), and we regard that as reasonably clear." (p. 498.)

In *State v. Tower,* 122 Kan. 165, 251 Pac. 401, this court said:

"The problem for solution is whether the legislature intended to cover a field with marked boundaries so that all cheats and frauds within that field should be subject to punishment, or consciously and purposely extended the statute so that it embraced a new field not theretofore thought of as lying within the domain of punishable false pretenses. In the books for the guidance of courts called on to interpret statutes, it is written that penal statutes are to be strictly construed, and statutes tending to suppress fraud are to be liberally construed. It is conceived that the first business of the courts is to ascertain, if possible, what the legislature intended, and if the meaning of the statute to be applied be reasonably plain, to accept that meaning without attempting either to restrain or to enlarge it." (p. 166.)

In Endlich on the Interpretation of Statutes, § 333, the law is stated:

"In construing statutes against frauds it has been said, that, where the statute acts against the offender and inflicts a penalty, it is to be strictly construed; but where it acts upon the offense by setting aside the fraudulent transaction, it is to be construed liberally." (p. 458.)

In 2 Lewis' Sutherland Statutory Construction, 2d ed., § 533, the

text quotes from the early English case of *Gorton v. Champneys,* 1 Bing. 287, decided in 1823, as follows:

"It is a law to prevent and suppress frauds; and it is a clear and funda- mental rule, in construing statutes against frauds, that they are to be liberally and beneficially expounded; and in our best textbook this position is to be found: that where the statute acts against the offender and inflicts a penalty, it is then to be construed strictly; but where it acts upon the offense, by setting aside the fraudulent transaction, here it is to be construed liberally." (p. 990.)

To the same effect are *Sharp v. Mayor, etc., of New York,* 31 Barb. (N. Y.) 572; *Cumming v. Fryer, Dudley's Rep.* (Ga.) 182.

The difficulty of making an exact definition of fraud has been frequently noted and discussed in the law books and decided cases. While in *City of Clay Center v. Myers,* 52 Kan. 363, 35 Pac. 25, our court has recognized the definition of fraud as stated in 1 Story, Equity Jurisprudence, § 187; Black's Law Dict., § 517; and in Bouvier's Law Dict., still it has recognized the difficulty involved in exactly defining the term. In *Eureka Bank v. Bay,* 90 Kan. 506, 135 Pac. 584, this court said:

"There is no clear and all-inclusive definition of the term 'fraud.' If there were it would soon need to be extended and corrected. Broadly speaking, all conduct may be said to be fraudulent which results in unconscientious ad- vantage over or injury to another." (p. 508.)

In *Stonemets v. Head,* 248 Mo. 243, 154 S. W. 108, it was well said:

"Fraud is kaleidoscopic, infinite. Fraud being infinite and taking on protean form at will, were courts to cramp themselves by defining it with a hard-and- fast definition, their jurisdiction would be cunningly circumvented at once by new schemes beyond the definition. Messieurs, the fraudfeasors, would like nothing half so well as for courts to say they would go thus far and no further in its pursuit." (p. 263.)

In *Guaranty M. Co. v. Wilcox,* 62 Utah 184, 218 Pac. 133, 30 A. L. R. 1324, the court held that a contract by a going investment company to dispose of increased shares of its preferred capital stock was a sale within the meaning of the blue-sky laws, and in discuss- ing the question of strict construction said:

"In this connection we desire to add here that we are not unmindful of counsel's contention that, in view of the very drastic penalties that are imposed by law, and of the consequences that may be visited even upon innocent persons in case the provisions of the law are violated, the law should receive a strict construction. The penalties are indeed drastic and the consequences harsh, but that, standing alone, does not authorize us to except transactions

that are clearly within both the spirit and the letter of the law, as well as within the mischief the law was intended to meet." (p. 193.)

In the case of *State v. Gopher Tire and Rubber Co.*, 146 Minn. 52, 177 N. W. 937, the court discusses the question of the construction of the blue-sky law. It that case it was said:

"The purpose of the statute is to protect the public against imposition. It is a new form of regulatory law which, in the course of a few years, has swept over thirty-three states. It has been said that its popular name indicates the evil at which it is aimed; that is, speculative schemes having no more basis than so many feet of blue sky (*Hall v. Geiger-Jones Co.*, 242 U. S. 539, 37 Sup. Ct. 217, 61 L. Ed. 480, L. R. A. 1917F, 514, Ann. Cas. 1917C 643; *State v. Agey*, 171 N. C. 831, 88 S. E. 726), and that it is intended to put a stop to the sale of shares in visionary oil wells, nonexistent gold mines, and other 'get-rich-quick' schemes calculated to despoil credulous individuals of their savings. It is a proper and needful exercise of the police power of the state and should not be given a narrow construction; for it was the evident purpose of the legislature to bring within the statute the sale of all securities not specifically exempted. . . . To lay down a hard and fast rule by which to determine whether that which is offered to a prospective investor is such a security as may not be sold without a license would be to aid the unscrupulous in circumventing the law. It is better to determine in each instance whether a security is in fact of such a character as fairly to fall within the scope of the statute." (pp. 55, 56.)

The action before us at the present time is civil and not criminal in its nature. It is one in which the operation of the statute applies to the offense and not to the offender. Since it is unnecessary to a decision of this case, we shall not at this time determine whether the statute shall be strictly or liberally construed in cases of criminal prosecution for violation of the law, but will determine the construction to be given the statute in all cases where it operates on the offense.

Realizing the difficulty courts have had in attempting to establish an exact definition of fraud, and the fact that the legislatures in enacting laws for the purpose of preventing fraud are confronted with this same difficulty, the rule of liberal construction of statutes designed to prevent fraud is unquestionably a proper one where the statute acts upon the offense. The general rule contended for by appellants is subject to an exception where the statute is one designed to prevent fraud when the application of the statute acts upon the offense and not the offender. It is our conclusion that in civil actions such as the case at bar, where the statute acts upon the offense committed, the blue-sky law is entitled to a liberal con-

struction in order to accomplish the purpose which the legislature had in mind when it enacted the law.

In view of this liberal construction, does the transaction shown by this record constitute a sale of securities of the defendant company and come within the provisions of the blue-sky law?

It is to be noted that the title of the act embraces "sale or disposition." Numerous authorities are cited by both the appellants and the appellee upon the definition of "sale." In *Edward v. Ioor,* 205 Mich. 617, 172 N. W. 620, 15 A. L. R. 256, it was said, in substance:

"The exchange by a holding corporation of its stock for the stock of the corporation which it is organized to take over, with the holders of such stock, is a sale within the meaning of a statute requiring foreign corporations to secure the consent of the corporation commission before selling their stock within the state."

In coming to this conclusion the court in the opinion said:

"Did the exchange of its stock for that of the other companies constitute a sale within the meaning of the commission act? This court has defined a sale as follows: 'A sale is a parting with one's interest in a thing for a valuable consideration.' (*Western Mass. Ins. Co. v. Riker,* 10 Mich. 279.) 'But every transfer of property for an equivalent is practically and essentially a sale, and the deed of bargain and sale is almost universally used to convey land so transferred. Money's worth is a valuable consideration, as much as money itself.' (*Huff v. Hall,* 56 Mich. 456, 23 N. W. 88.) Bouvier defines a sale as: 'An agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price.' (3 Bouvier's Law Dict. 2983.) . . . We must assume that the legislature had in mind this well-understood meaning of the word 'sale' when the commission act was passed. If the act is not so construed, as was suggested upon the argument, one may exchange worthless stock for government bonds and escape with impunity." (p. 623.)

It has been held that an exchange of lands is nothing more nor less than a sale. (*Barton v. Jones,* 206 Ky. 238, 267 S. W. 214.) Definitions limiting the meaning of the word "sale" to transactions wherein title to property is transferred for actual money only are too narrow and are not sound. The consideration passing may be money or money's worth. Applying the definition laid down in the authorities cited, it is readily seen that the plaintiff parted with her interest in the oil and gas rights for a consideration, namely, the units of the defendant company.

The appellee has called our attention to the case of *Marney v. Home Royalty Ass'n,* recently decided by the supreme court of New Mexico and reported in 286 Pac. 979. This was an action involving

the construction of the blue-sky law of that state. In that case it was held:

"The blue-sky law is penal and to be strictly construed; but not to exclude the ordinary meaning of the term employed in denouncing the act, in favor of its narrower meaning, where the latter meaning would tend to defeat the salutary purposes of the legislation. (Syl. ¶ 2.)

"The consideration for the 'speculative security' being a conveyance of minerals and mineral rights, the transaction is a 'sale' within the prohibition of the blue-sky law." (Syl. ¶ 3.)

The facts in that case were almost identical with the case at bar. The defendant in that case was a common-law trust operating under the same plan as the defendant in this case. The action was brought to set aside a royalty conveyance made to the plaintiff in exchange for a certificate of participation issued by the defendant. As here, the defendant contended that the transaction was a mere exchange or barter and was not prohibited by the word "sale." In that case the court further said:

"We are satisfied that the strict construction, to which we are enjoined in the case of a penal statute, does not require that we close our eyes to a reasonable and ordinary meaning of the word 'sell' and plant ourselves upon the narrowest meaning which it will bear; especially where such interpretation would in many cases defeat the salutary objects of the legislation and open the door to evasion. *Ex parte De Vore,* 18 N. M. 246, 136 Pac. 47. While the word 'sell' seems to be employed throughout in the body of the act, the title informs us of the purpose to prevent fraud in the 'sale or disposition' of securities. Every reason for prohibiting a sale of speculative securities exists for prohibiting a disposition of them by way of exchange. The narrow interpretation contended for cannot in our judgment have been the intention of the legislature." (p. 980.)

The transaction involved in this case was a "sale of the securities of the defendant company within the meaning and intent of the blue-sky law."

Since such a transaction is prohibited by the statute, it is void. The statute being one clearly intended for the protection of plaintiff, she is entitled to a recovery of that which was illegally obtained from her. See the following: 13 C. J. § 443, p. 499; *Mason v. McLeod,* 57 Kan. 105, 45 Pac. 76; *Pinney v. Bank,* 68 Kan. 223, 75 Pac. 119; *Nyhart v. Kubach,* 76 Kan. 154, 90 Pac. 796; *Latham v. Harrod,* 71 Kan. 565, 81 Pac. 214; *Merriam v. West,* 114 Kan. 131, 216 Pac. 1102.

The appellants make a contention to the effect that inasmuch as the plaintiff did not surrender into court the certificate for the units

issued to her, she is not entitled to quiet title. It appears that at the time of the trial her certificate for the units had been mislaid and could not be found. Under these conditions the court made a decree canceling the certificate. Counsel for the appellee stated in open court upon the argument of this case that he has now found the certificate and is in position to turn it over to the court.

This leaves the question as to whether or not the court erred in allowing plaintiff an attorneys' fee of $250.

The plaintiff did not include in her petition any cause of action for damages sustained by way of attorneys' fees necessarily incurred in this suit, but after the case had been tried, and before the court rendered judgment, filed a motion asking that a reasonable attorneys' fee be allowed on account of the fact that defendants had refused to cancel the royalty conveyance and release it of record and she was, therefore, obliged to employ attorneys to bring this action. In support of the allowance made by the court the appellee cites *Bank v. Williams*, 62 Kan. 431, 63 Pac. 744; *McOsker v. Federal Insurance Co.*, 115 Kan. 626, 224 Pac. 53, and other Kansas decisions therein cited. We have examined these cases and find that in neither of them were the attorneys' fees allowed for the prosecution of the instant case. The attorneys' fees permitted to be recovered in those cases were incurred in previous litigation wherein the party who had been injured by the perpetrator of the fraud had incurred attorneys' fees in an effort to save himself from loss occasioned by the fraud. In *Bank v. Williams*, supra, it was said:

"The attorneys' fees and expenses in the present action of the bank against Williams are not sued for or claimed. The expenses paid by the bank were incurred before this action was commenced. They were necessary and arose solely as a result of the fraud of defendant below." (p. 434.)

In that case the defendant obtained a draft from the bank and then caused it to be cashed, and the bank incurred attorneys' fees in an honest effort to defeat a recovery on the draft. In turn it brought action against the wrongdoer who fraudulently obtained the draft from it, and was permitted to recover the attorneys' fees which it had incurred in the previous action. In each of the Kansas cases cited the situation was similar to that of the case of *Bank v. Williams*. We are unable to find any previous decision of this court allowing the recovery of attorneys' fees under circumstances similar to those in the case at bar.

In 27 C. J. 87, § 234, the general rule on the question of the right to recover attorneys' fees in similar actions is stated as follows:

"Expenses of litigation and attorneys' fees incurred in a tort action for fraud are by the weight of authority held to be nonrecoverable."

In *Baird v. Gibberd,* 32 Idaho 796, 189 Pac. 56, this question was considered and the court said:

"The authorities are not agreed upon the question whether attorney fees are recoverable in a tort action based upon fraud. Even in those states where a recovery is permitted there is disagreement in the authorities as to whether they are recoverable as special or general damages, whether they need to be specially pleaded, or whether proof should be admitted, and whether they come within the class of compensatory or exemplary damages, but they seem never to have been allowed except in states where exemplary damages are recoverable. (Citing decisions.)

"We are unable to see why attorney fees, or any other expense of litigation, should be treated as exemplary damages. On the other hand, if viewed as compensatory damages, there is no sound reason apparent to our mind why they should be allowed in this class of actions rather than in any other kind of a tort action. We believe the correct rule is to disallow them entirely." (p. 803.)

It may well be argued that since the blue-sky law is a statute intended to prevent fraud and that since the defendants have violated an express statute of this character, that there is some justification for penalizing them by allowing an attorneys' fee to be recovered in this action. It may well be contended that since the defendants disregard an express statute the court is justified in an equitable action in seeking to set aside the transaction resulting from the violation of the statute, in allowing an attorneys' fee as a matter of equity and right. The blue-sky law has been amended several times by the legislature of this state since its enactment in 1915. Considerable litigation has heretofore resulted from the violation of this statute. The legislature might very well make a provision, if it saw fit, to further penalize one who violates this statute by specifically providing, in actions such as the one now before the court where an attorneys' fee is incurred in setting aside the transaction, that a reasonble attorneys' fee might be allowed by the court. Several instances are to be found in our statutes where the legislature has deemed it advisable to permit the allowance of attorneys' fees by way of penalty, as for example, refusal of a fire insurance company to pay a loss, failure to release a mortgage when the indebtedness has been paid, and failure to release an oil-and-gas lease under certain circumstances, but in the statute now before the court the legislature did not see fit to make any provision for such an allowance. We feel that for this court to allow an attorneys'

fee in this case would be invading the proper province of the legislature and would be judicial legislation on our part.

That part of the judgment of the district court allowing an attorneys' fee to the plaintiff will, therefore, not be permitted to stand. The district court is directed to modify its judgment by setting aside the allowance of the $250 attorneys' fee.

It is further directed to order the certificate of units issued to the plaintiff to be delivered to the clerk of the district court for the purpose of surrendering it to the defendants.

As so modified, the judgment is affirmed.