No. 32,681

John R. Fitch, *Appellee*, v. United Royalty Company, M. H. Watts, John E. Woodward and Jack Stewart (Liberty Royalties Corporation et al., Interveners), *Appellants*.

(55 P. 2d 409)

Opinion filed March 7, 1936.

*W. L. Cunningham, D. Arthur Walker, Fred G. Leach, William E. Cunningham,* all of Arkansas City, *Austin M. Cowan, C. A. McCorkle, J. D. Fair, W. A. Kahrs, Robert H. Nelson,* all of Wichita, and *Max G. Cohen,* of Tulsa, Okla., for the appellants.

*George W. Stanley* and *C. L. Swartz,* both of Arkansas City, for the appellee.

The opinion of the court was delivered by

Dawson, J.: This was an action to cancel a deed conveying a royalty interest in Sumner county land to the United Royalty Company, a common-law trust domiciled in Oklahoma.

The pertinent facts were these: In August, 1922, three men, Pochel, Burnham and Landon, organized a common-law trust for accumulating and pooling oil-and-gas royalty interests in lands. The organizers gave it the name of The United Royalty Company, assumed its management as trustees, and filed a declaration of trust specifying its nature and purposes in a public record office in Kay county, Oklahoma. To pay for the royalty interests it desired to acquire the trustees created 2,000,000 unit interests in the trust

estate, which were to be apportioned and assigned to owners of lands having oil-and-gas possibilities in exchange for deeds conveying royalty interests to this common-law trust.

Pursuant to its avowed purposes, this defendant trust, The United Royalty Company, acquired royalty interests in some 50,000 acres, for which it gave in exchange reciprocal and proportionate unit interests in the trust estate.

One of these transactions is the matter of present concern. On January 27, 1928, plaintiff executed a deed conveying to the United Royalty Company an undivided one-eighth interest in the potential gas-and-oil royalties on a tract of Sumner county land owned by him. This conveyance was to endure for twenty-one years and "as long thereafter as oil and gas, or either of them, is produced in paying quantities on any of the acreages in the block belonging to the United Royalty Company." In consideration of this conveyance defendant assigned and delivered to plaintiff 1337 units of the trust estate.

In the years that followed plaintiff from time to time received his proportionate share of the profits of the trust estate, the amounts and number of which the record does not disclose. About eighteen months after the transaction above mentioned, plaintiff executed his written consent to an amendment to the defendant's declaration of trust. During the interval since plaintiff executed to defendant his royalty deed the personnel of the defendant trust has changed. Pochel, Burnham and Landon have retired. The present trustees are the defendants, Watts, Woodward and Stewart.

On September 8, 1932, plaintiff commenced this action to cancel the deed he had executed to the United Royalty Company in 1928, and to quiet his title to the land affected thereby. His petition alleged some of the foregoing facts, set out the declaration of trust at length, and alleged that at the time he conveyed the royalty interest in his land to defendant (and received in exchange therefor certain unit interests in the trust estate) the principal defendant had not received a certificate from the state of Kansas authorizing it to sell or issue its speculative securities, in consequence of which the transaction between plaintiff and the principal defendant, United Royalty Company—

"Was made in violation and defiance of that portion of the laws of the state of Kansas generally known as the blue-sky laws, and that such sale was fraudulent and void."

Some less consequential allegations of plaintiff's petition will need no present attention. Plaintiff concluded with a prayer for the cancellation of the royalty deed and that his title to the land described in that royalty deed be quieted.

Attached to plaintiff's petition, in addition to the declaration of trust, was a copy of the instrument executed by defendant to plaintiff reciting his ownership of 1,337 units of the trust estate. There was also attached to the petition a copy of the royalty conveyance which plaintiff had issued to the United Royalty Company, which plaintiff sought to have canceled in this action.

The United Royalty Company's answer, among other matters, raised a legal question touching the sufficiency of the petition to state a cause of action, pleaded various matters of fact of no present concern, and alleged further:

"Said royalty deed was executed and delivered to defendants in consideration of the issuance and delivery by defendant of its certificate to said plaintiff for 1,337 units of said trust and trust estate. Plaintiff accepted said certificate and units on the date of the delivery of said royalty conveyance and accepted said certificate and units in consideration for said conveyance. . . . During the period from the date of said certificate [January 27, 1928] until the institution of this suit [September 8, 1932] said plaintiff has retained and held said certificate and has received and accepted from defendants the share of income proceeds and other benefits to which all certificate holders, unit holders and beneficiaries of said trust have been entitled. Plaintiff during said period has been and now is one of the unit holders and beneficiaries of said trust and has accepted and retained substantial sums of money as his share of income of said trust estate.

"Said plaintiff, John R. Fitch, commenced and filed this cause of action subsequent to and after the statutes of limitations within which plaintiff's cause of action must be brought had expired. Plaintiff is now estopped and barred from instituting and maintaining this cause of action, because said cause of action was not commenced and filed within the period of limitations.

"Sixth. Plaintiff delayed the filing of this suit for an unreasonable length of time, and during said period plaintiff stood by and permitted numerous parties to purchase for valuable consideration and substantial sums of money large numbers of units in said trust and trust estate, including the royalty rights described in plaintiff's petition, and permitted and suffered said innocent purchasers to acquire beneficial and equitable interest in the aforesaid royalty conveyance without any notice of any claim of plaintiff. Said sales and purchases of units were made by numerous innocent parties for valuable consideration, and if plaintiff should be permitted to maintain this action it would cause irreparable and irredeemable loss, damage, injury and harm to a large number of persons who innocently and in good faith purchased said units for valuable consideration during the period that said plaintiff unreasonably delayed the commencement of this suit. By reason thereof plaintiff is guilty of

laches in the commencement of his action, and therefore should be estopped and barred from asserting and maintaining this cause of action."

Defendant also alleged that during the long interval following the execution of the royalty conveyance plaintiff gave no intimation of any intention to question the validity of his deed of conveyance, and during that period and in reliance on that deed and similar deeds defendants had sold and exchanged other unit interests to a multitude of third parties, which interests were necessarily predicated on the royalty deed executed by plaintiff and other similar royalty deeds, and—

"Said plaintiff, by his acts and omissions, for remaining silent for a long and unreasonable length of time and during said time accepting all of the rights and benefits to which he was entitled under said trust, and failing during said period of time to assert any right, if any he had, to declare his conveyance to said trust void, was and is guilty of laches, and plaintiff is now estopped to assert any claim against the validity of said royalty conveyance made by him to said trust; . . . and plaintiff is estopped from asserting any claim or right to cancel said royalty conveyance made by plaintiff to said trust, and is estopped from maintaining any action to enforce any such claim or demand, and plaintiff has further failed, neglected and refused to tender back any of the dividends, units or any other benefits received by reason of his original pooling agreement or the amendment of contract, and has failed to make or offer to make this defendant whole, by reason of all of which the plaintiff is estopped, as aforesaid, from maintaining any action to enforce any claim or demand of cancellation."

Various parties interested in the outcome of this action were permitted to intervene and set up their several interests, particularly their acquisition and ownership of units of the trust estate. One of these, the Liberty Royalties Corporation, had acquired 913,903 units, or nearly half the entire issue, for which it had conveyed to the defendant trust estate a large number of gas, oil and mineral royalty conveyances, which it had acquired at a cost of $217,568.70. As against plaintiff this intervener pleaded the statute of limitations and all the usual equitable defenses—his long-continued silence after notice, acquiescence, ratification, laches and estoppel.

Other unit holders were permitted to intervene and set up their interest in the subject matter of the litigation.

Plaintiff filed demurrers against the pleadings of the principal defendants and the interveners. These were sustained on the following specific grounds, as shown in the journal entry of judgment:

"1. That the United Royalty Company, to whom conveyance was attempted to be made of the royalty interests in question, is to be treated as a corporation, but has never been organized under the laws of this state as a corporation

and admitted to do business in this state, and had no legal entity or existence, and the attempted conveyance was a nullity, for the reason that there · was no grantee in existence to take said conveyance, and therefore the defenses of estoppel, ratification, statute of limitation and others pleaded are without avail.

"2. That the United Royalty Company never obtained a blue-sky permit authorizing the sale or transfer of such units to the plaintiff, was unlawful, and the conveyance of the royalty interest was without consideration and void, and, being void, the defenses of ratification, estoppel, statute of limitation and others presented by the various answers are without avail."

Defendants appeal, urging various matters of law in an effort to demonstrate that the trial court's judgment is erroneous.

The constitution (art. 12, § 6) does say that the term "corporations" shall include all associations having powers not possessed by individuals or partnerships; and so, on occasion, this court has said that a common-law trust, in so far as it has powers not possessed by individuals, is to be regarded as a corporation. In *Lumber Co. v. State Charter Board*, 107 Kan. 153, 190 Pac. 601, 10 A. L. R. 879, the nature of a common-law trust was under consideration, and in the syllabus it was said:

"The trust, although an unincorporated company, is deemed' to be a corporation within the meaning of section 6 of article 12 of the state constitution, since the agreement under which the company is organized gives it powers and privileges not possessed by individuals or partnerships. . . ." (Syl. ¶ 2.)

But just what powers a common-law trust does enjoy in Kansas which are not possessed by individuals or partnerships this court has not had occasion to decide. In *Linn v. Houston*, 123 Kan. 409, 255 Pac. 1105, it was said:

"A common-law trust is or may be a very convenient device for the accumulation of sufficient assets to give commercial prestige in the conduct of business, and may be more elastic and adaptable to the business undertakings and projects of its creators than a limited partnership or ordinary corporation would be. So, too, it is less handicapped with *ultra vires* problems and the necessity of conforming to discordant state laws governing corporations and the payment of burdensome corporation taxes. But a common-law trust certainly has none of the attributes of limited liability or freedom from personal liability which attach to limited partnerships and ordinary corporate organizations. Freedom from personal responsibility for breach of their business contracts is not a matter which a group of men can confer upon themselves by the creation of a trust, without the sanction of a statute to that effect, or without the intelligent contractual consent of the parties with whom they deal. (*Weber Engine Co. v. Alter*, supra, 46 A. L. R. 158, 171, *et seq.*)" (p. 412.)

Where men undertake to form a corporation, but fail to perfect it in conformity to the statute, the result is that any liabilities incurred on behalf of such abortive organization fall upon them as individuals. (*Lithographing Co. v. Crist,* 98 Kan. 723, 160 Pac. 198; *Bolinger v. Giles,* 125 Kan. 53, 55, 56, 262 Pac. 1022.) Conversely, the persons subject to individual liability on behalf of an abortive corporation or other organization akin thereto (which under the constitution would include a common-law trust unregulated by some pertinent statute) are entitled to the assets which have been acquired in its behalf. There are no forfeitures or confiscations recognized in Kansas law except in deference to some specific statute. In the notable ouster suits against brewing corporations a generation ago, of which *State, ex rel., v. Brewing Association,* 76 Kan. 184, 90 Pac. 777, was typical, receivers were appointed to take charge of their properties and to supervise their conveyance and transfer to legitimate grantees and to legitimate enterprises. The defendant corporations were legitimate organizations in the states of their domicile, but they had no corporate rights and could obtain none to transact their corporate business in Kansas. This court declined to countenance the idea that the properties standing in the names of the defendant corporations should be seized as the public property of the state of Kansas or that the deeds under which they had taken title were defeasible. The court said:

"Receivers for the defendant's property were not appointed for the ultimate purpose of confiscation or other appropriation, except to such an extent as might be necessary to prevent the defendant from rendering ineffectual a judgment for costs. There is no law of the state transferring to itself the title to property of a corporation which has unlawfully usurped franchises, and without such a law the court cannot enter a judgment of forfeiture. 'The court has no power to create a forfeiture, and no power to declare a forfeiture where none exists.' (*The State, ex rel., v. Wilson,* 30 Kan. 661, 2 Pac. 828.)

"Even if the defendant were ousted from certain franchises wrongfully exercised it would continue to be a corporation, and its property would still belong to it for the prosecution of all enterprises in which it might lawfully engage elsewhere. If all its franchises were seized and the corporation dissolved the further conduct of business would necessarily cease, but the claims of creditors upon the corporate assets could not be annihilated, and the residue upon the winding up of the concern would belong to its stockholders. All this is elementary (*State Bank v. The State,* 1 Blackf. [Ind.] 267; *State v. West Wisconsin Railway Company,* 34 Wis. 197, 215; *People v. O'Brien et al.,* 111 N. Y. 1, 18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684). . . ." (p. 190.)

The court's final order was as follows:

"All real estate belonging to the defendant shall be sold. The defendant is allowed a reasonable time in which to make sales, and upon application to the court, accompanied by proof of an actual sale in good faith, any parcel of real estate will be discharged from the custody of the receivers. If after reasonable opportunity to dispose of it without undue sacrifice, any real estate remains unsold, the receivers shall sell it as upon execution and pay the proceeds, after deducting expenses, to the defendant." (p. 196.)

In 4 Thompson on Real Property, § 2956, it is said:

"A deed to a corporation which is forbidden by its charter to purchase and hold real estate is void. In such case the corporation being prohibited to take and hold real estate for any purpose, it would seem to be wholly wanting in the capacity to take title under a deed. But probably the better view is, that even in such case the deed is not absolutely void, but only voidable at the instance of the state. It is valid until assailed by the sovereign power. Thus, where a New York corporation took a deed to real estate in Pennsylvania, where by statute a foreign corporation is forbidden to acquire and hold real estate, it was held that the deed to the corporation was not void, but conveyed title to it under which it could maintain ejectment, and that the state of Pennsylvania alone could object to the legal capacity of the corporation to hold the land."

In the same treatise (§ 2968) it is said:

"The question whether a foreign corporation can acquire and hold land is a question which can be determined only by the state in a proceeding instituted for that purpose. The rule is the same as that which prevails as to domestic corporations, when the question is raised whether they have exceeded their corporate powers. It is not presumed to be a matter of concern to a private individual whether or not a corporation has complied with the law. Even in case a foreign corporation is prohibited from acquiring and holding real estate, the state alone can object to the legal capacity of the corporation to take and hold real estate. Whether the right of a foreign corporation to hold land arises under the terms of its charter, or of the laws of the state under which it is organized, or whether it arises with reference to its authority under the laws of the state in which the lands are situated, the right can be questioned only by the state itself in which the land is situated."

And so here. If the United Royalty Company has acquired any real estate or interests in real estate which Kansas law does not tolerate a common-law trust to hold (and on that point we make no present decision), that matter will be the concern of the state's properly constituted public officials. Certainly this plaintiff cannot take up the cudgels on behalf of the public for the mere purpose of causing a defeasance of defendant's title.

Whatever was lacking in the United Royalty Company's right as a common-law trust to transact business in Kansas at the time plaintiff executed to it a royalty interest in his Sumner county

land, the grantee did have a legal entity in the state of its domicile, Oklahoma. As such, the conveyance by plaintiff was not void because of any lack of legal capacity to be the grantee of a conveyance of an interest in Kansas land. A common-law trust does have that capacity, although it may not have any peculiar privileges not possessed by individuals or general partnerships. (*Lumber Co. v. State Charter Board,* 107 Kan. 153, 156-159, 161-163, 190 Pac. 601, and citations; *Harris v. Oil Co.,* 110 Kan. 532, 204 Pac. 754; *Hamilton v. Young,* 116 Kan. 128, 225 Pac. 1045; *Weber Engine Co. v. Alter,* 120 Kan. 557, 245 Pac. 143; 65 C. J. 1086 *et seq.*)

Coming now to the legal consequences arising from the fact that the United Royalty Company had not procured a permit authorizing it to issue speculative securities before it issued to plaintiff 1,337 units of the trust estate in exchange for his royalty deed, the trial court held that the transaction was void. That ruling was incorrect. It was voidable only. (*Westhusin v. Landowners' Oil Ass'n,* ante, p. 404, this day decided.) Plaintiff could have rescinded the contract of sale and exchange if he had been so inclined and if he had acted with reasonable diligence. (*Wigington v. Mid-Continent Royalty Co.,* 130 Kan. 785, 288 Pac. 749; *Ward v. Home Royalty Ass'n,* 142 Kan. 546, 50 P. 2d 992.) If he had merely promised to convey to defendant a royalty interest in his land for 1,337 units of the trust estate he could have defeated an action by defendant for specific performance or for breach of contract. If he had bought the 1,337 units and had given his promissory note to pay for them, a plea of illegality would have been a good defense to any such action. (*Merriam v. West,* 114 Kan. 131, 216 Pac. 1102; *Reilly v. Clyne,* 27 Ariz. 432, 234 Pac. 35, 40 A. L. R. 1005.) If plaintiff had bought these 1,337 units and had paid the cash for them he could have maintained an action, timely begun, against the original trustee with whom he dealt, for the recovery of the purchase price. (*Daniels v. Craiglow,* 131 Kan. 500, 292 Pac. 771.) Instances to the same effect could be indefinitely multiplied, and it is on such precedents that counsel for the appellee seek to uphold the trial court's decision.

But the case before us arises out of a transaction which was consummated in 1928 and not questioned for nearly five years thereafter. Meantime the plaintiff had received his proportionate share of the dividends or profits arising from the defendant's pooling venture, which had only been made possible by his long acquiescence. Not to this day has he indicated that he was under any legal or moral

obligation to return the *quid pro quo* he has received for the conveyance whose cancellation he now demands. Even the textbook law his counsel quote for our instruction does not countenance such an attitude. They quote 5 Fletcher, Cyclopedia Corporations, § 3486, as follows:

"Stock issued without authority and in violation of law is void, and confers no rights on the person to whom it is issued, and subjects him to no liabilities. A contract to issue stock in violation of the provisions of the constitution or of the statute will not be enforced by the courts, nor can damages be recovered for its breach. A person may rescind his contract to subscribe for or purchase such stock and recover back what he has paid for it, *upon a tender back or surrender of the certificate, and of any dividends which he has received.*" [Italics ours.]

To the same effect were *Beneke v. Bankers Mortgage Co.*, 119 Kan. 105, 237 Pac. 932; *Springer v. Keller*, 124 Kan. 369, 259 Pac. 1068. See, also, 51 C. J. 228.

In appellee's brief a common-law trust is discussed as if it were an iniquitous thing. That, of course, is a matter of opinion; but it may be remarked that if it had asked for a blue-sky permit and had paid the prescribed statutory fees, there is no reason to assume that such permit would have been withheld on account of any supposed iniquity in its character. Other common-law trusts have been granted permits by our blue-sky department. (See 12th Biennial Report of State Corporation Commission, pp. 23-28.) So we must regard defendant's omission to provide itself with a blue-sky permit as a mere breach of statute, *malum prohibitum*, not *malum in se.* It is therefore apparent that the rule of law which declares that a contract tainted with illegality because of some inherent vice which brings it under the ban of an express statute is incapable of ratification does not apply. Neither does the related rule barring defenses of estoppel or latches apply. (*Wichita Duntile Co. v. Wright*, 130 Kan. 139, 285 Pac. 635; *Moos v. Landowners Oil Ass'n*, 136 Kan. 424, 15 P. 2d 1073; *Beltz v. Griggs*, 137 Kan. 429, 20 P. 2d 510.) See, also, *Frazier v. Jeakins*, 64 Kan. 615, 626, 68 Pac. 24; *Good v. Starker*, 216 Wis. 253, 257 N. W. 299.)

The foregoing does not exhaust the reasons which may be given to show that the net result in the trial court below was erroneous. Even granting that the transaction between plaintiff and the United Royalty Company in 1928 was fraudulent because of the mere want of a blue-sky permit, plaintiff's action for relief on the ground of fraud could not be commenced after two years measured from

the time the plaintiff learned, or readily could have learned, that the 1337 units he had gotten for his royalty interest had been issued without the sanction of the blue-sky department. (*Hege v. Suderman*, 142 Kan. 495, 51 P. 2d 23, and citations.)

Touching the right of the interveners to have their rights protected in this lawsuit, it is fundamental that once an intervener is let in to participate in litigation, his rights are just as much entitled to judicial protection as those of the original parties, provided a full adjudication of his rights does not alter the essential character of the litigation. (*Hoxie State Bank v. Vaughn*, 137 Kan. 648, 651, 21 P. 2d 356; 47 C. J. 93, 115-116.) It needs no argument to show that if plaintiff should prevail in this action the rights of the interveners would be appreciably diminished. They put their royalty rights in defendant's pool on the faith of plaintiff's conveyance, and they suffered plaintiff from time to time to receive his prorata share of the profits of the pool—whatever they were—which were derived from the pool.

The judgment of the district court is reversed, with instructions to enter judgment for defendants.

HARVEY, J., dissenting.