No. 33,722

FANNIE WEBSTER, CLARK WEBSTER et al., *Appellants*, v. BELLE TO-
LAND, HENRY TOLAND, and BELLE TOLAND, as Administratrix of
the Estate of Charles Toland, Deceased, et al., *Appellees.*

(79 P. 2d 884)

Opinion filed June
11, 1938.

*W. B. Hess*, of Pratt, *W. D. Jochems, J. Wirth Sargent, Emmet A. Blaes,
Roetzel Jochems* and *W. G. Muir,* all of Wichita, for the appellants.

*William Barrett, George Barrett* and *Robert G. Miller,* all of Pratt, for the
appellees.

The opinion of the court was delivered by

DAWSON, C. J.: This was an action to set aside a family settle-
ment, to cancel certain instruments executed pursuant thereto, and
for equitable relief. Defendants' demurrer to evidence was sus-
tained, and plaintiffs appeal.

The controlling facts were these: The late Charles Toland, of
Pratt county, died intestate on November 14, 1934, leaving a wife,
Belle Toland, and two sons, Henry and Roy, and four daughters,
Fannie, Eula, Mary and Ruth. All the children had grown up and
all the daughters were married.

Although Charles could neither read nor write, he had accumulated
a sizeable fortune in lands in Pratt and Seward counties, and also a
section of land in Yuma county, Colorado.

In 1913 the plaintiff, Fannie Toland, married Clark Webster, a
farmer, and they resided on rented lands for some years. In 1918

Clark Webster entered into an oral agreement with his father-in-law, Charles Toland, for the purchase of 240 acres of land at an agreed price of $13,500, with 6 percent interest. Webster paid $2,000 in cash on the agreed price and took possession of the land, and he and his wife have resided thereon since then. Title remained in Charles Toland until his death. How much Webster owed on the property at that time was not determined, but Webster testified that it was $2,500.

Following the death of Charles, his widow qualified as administratrix, and filed an inventory of the value of the estate summarized thus:

(1) Total value of all goods and chattels........................ $6,879.00
(2) Total value of all bonds, mtges., notes and other securities..... 9,000.00
(3) Total value of all debts and accounts........................ 150.00
(4) Total value of all moneys, bank bills, and other circulating medium ............................................... .............
(5) Total value of all real estate (Pratt Co. lands)............... 59,500.00

Total appraised value of all property..................... $75,529.00

Later a supplemental inventory was filed, covering lands in Seward county, Kansas, and Yuma county, Colorado, appraised at $18,400; and one covering miscellaneous bonds, notes, etc., listed at $2,200. The aggregate of these amounts is $96,129, which for the purposes of this appeal will have to serve as a rough approximation of the value of the Charles Toland estate. There was no finding of its net value, nor evidence in the record on which a precise computation thereof can be made. We note that two quarter sections of the Toland lands in Seward county were covered by a mortgage lien for $2,926.90.

Some weeks after the death of Charles Toland all the parties to this lawsuit effected a family settlement whereby the administratrix canceled whatever indebtedness was owed by Clark Webster on the farm he had orally purchased from the intestate some 18 years previously. The widow and her two sons and her other three daughters and their spouses executed a deed to Clark and Fannie Webster conveying to them the 240 acres which they occupied. At the same time Fannie Webster and her husband executed to her mother and to her two brothers and three sisters an instrument designated "Assignment and Deed," in which they relinquished all their interest in the estate of Charles Toland and particularly describing all the lands of that estate in Pratt and Seward counties and in Yuma county,

Colorado. This instrument contained all the essentials of a deed of conveyance. All three of the instruments were dated December 27, 1934.

On December 1, 1936, plaintiffs commenced this action against the defendants, alleging that at the time the family settlement was made and the instruments executed as narrated above, they had no knowledge or information of the value and extent of the estate of Charles Toland, but that such information was in the possession of Belle Toland and her sons Henry and Roy Toland; that they represented to plaintiffs that they did not know the extent and value of the estate, and that there would not be sufficient assets aside from the real estate to pay the taxes on the lands and the costs of administration, and that the estate consisted almost exclusively of real estate of the approximate value of $86,000.

Plaintiffs alleged that they believed and relied on the representations of the defendant mother and her sons; that those representations were not true, and known to defendants to be untrue; that defendants did know that the value and extent of the estate "was a great deal more than the sum of $86,000, and that they well knew;" and that defendants Henry and Roy Toland were indebted to the estate "in the sum of several thousand dollars," and that such debts "were intentionally omitted from said pretended inventory;" and that defendants concealed the foregoing alleged facts from plaintiff Fannie Webster, for the purpose of making a settlement for her share of the estate for a small proportion of its value, and—

"That plaintiffs would not have entered into such pretended settlement except for such inducements, misrepresentations and concealments, and in their confidence that the said three defendants would deal justly and fairly with them."

The prayer of plaintiffs' petition was for cancellation of the instruments executed to effect the family settlement, and that plaintiff Fannie Webster be adjudged to be the owner of a one-twelfth interest of the Charles Toland estate and for other equitable relief.

To this petition an answer was filed by the mother, her two sons and by her daughters, Mary and Ruth, defendants herein. It contained certain general and special denials and admissions, and alleged that Charles Toland in his lifetime had made advancements to certain of defendants—to Henry Toland, $6,000; to Roy Toland, $2,200; and to their sister, Ruth Bales, $2,322, all of which sums they admitted were proper charges against their distributive shares

of the estate. Their answer also contained a detailed and categorical denial of every allegation in plaintiffs' petition which directly or inferentially charged the commission of fraud by them or any of them in effecting the family settlement.

Defendants also alleged that in that settlement an indebtedness of Clark Webster in the sum of $15,580 as the balance of the principal and interest due from him to the estate on the purchase price of the farm occupied by plaintiffs was remitted.

Defendants further answered that since the family settlement was effected, plaintiffs had received rents, issues and profits on the land conveyed to them by defendants, and had altered the gas and oil lease thereon so that the delay rentals should be paid to them and were so paid; and furthermore—

"14. That on the 25th day of April, 1936, the plaintiffs did mortgage said lands so received by them, together with other lands, to the Iuka State Bank of Iuka, Kansas, in the principal sum of $9,000, which mortgage was duly recorded in the office of the register of deeds of Pratt county, Kansas, in book 79, at page 283 of the mortgage records of said office.

"15. That by reason of the acts and conduct of said plaintiffs they should be estopped from asserting any right or claim in and to the estate of said Charles Toland, deceased, or to the property so conveyed to the defendants herein."

Belle Toland also filed a separate answer as administratrix, which may not require special attention.

One of the daughters of Charles Toland, Eula Lattimore, who in 1935 had also settled with the mother, and her brothers and two of her sisters, Mary and Ruth, for her share of the estate, filed a separate answer and cross-petition in which she neither affirmed nor denied the allegations of plaintiffs' petition, but claimed an interest in the estate if the family settlement of December 27, 1934, should be set aside. There were further pleadings, but those summarized above will be sufficient to develop the material issues involved in the action.

The cause was tried by the court without a jury. The plaintiffs adduced evidence which tended to show that the Charles Toland estate was of greater value than $86,000—which, according to the allegations of plaintiffs' petition, was its approximate value as estimated by Belle Toland and her two sons, to induce plaintiffs to agree to the family settlement. Plaintiffs' evidence, insofar as we can glean it from the record, would tend to show that its value was about $99,055.90—not such a remarkable disparity in the value of an estate of that size, based, as it necessarily was, upon the opinions of

witnesses not specially skilled in land values where the Toland lands were situated. One particular weakness in plaintiffs' case was their failure to develop the facts touching whatever liabilities, taxes and costs may have been chargeable against the estate; and it cannot be said that the *net* worth of the estate was established so as to base a judgment touching the extent to which the plaintiffs were over-reached, if at all, in the family settlement.

A careful perusal of the record does not establish certain other essentials to a recovery on behalf of plaintiffs. They did not show that defendants, or any of them, knowingly misrepresented any material facts touching the extent of the estate, nor that they concealed any material facts, of which they should have informed plaintiffs. Certainly it was not established that at the time of the settlement the defendants were knowingly stating a falsehood when they declared that they did not know whether the personal property would be sufficient to pay all claims and charges against the estate, or whether it would be necessary to sell some of the Toland lands to satisfy them. Doubtless counsel for plaintiffs are aware of the limitations of an appellate review of matters which inherently involve problems of accountancy. In *Allen County Comm'rs v. Board of Education,* 142 Kan. 770, 772, 51 P. 2d 973, it was said:

"We desire to make a general observation touching the inherent limitations of an appeal in an accounting case. An appellate court does not undertake the functions of an accountant or special auditor, nor does it recheck his work to discover possible inaccuracies in his figures or arithmetical processes. Trial courts may find it practical to scrutinize such details with particularity, or if they are too greatly pressed for time they may assign such tasks to a referee. (R. S. 60-2923.) The result of an accounting by auditors employed by order of court or with its sanction has substantially—although not technically—the same effect as the report of a referee. It needs only the approval of the court to become a conclusive finding of fact on which a judgment may be entered; and that judgment can only be overthrown on appeal by showing some plain and demonstrable error which inheres in the accounting." (Citing *Farmers State Bank v. Commercial State Bank,* 136 Kan. 447, 16 P. 2d 543; and *City of Oswego v. Condon,* 124 Kan. 823, 825, 262 Pac. 542.)

If the trial court's ruling on the demurrer rested solely on the insufficiency of plaintiffs' evidence to maintain their cause of action, it would be difficult for this court to decide that such ruling was erroneous. In *State v. Order of Eagles,* 98 Kan. 793, 161 Pac. 903, this court affirmed a judgment sustaining a demurrer to the state's evidence in a liquor nuisance case. On a motion for rehearing counsel for the state, the late Attorney-general Brewster, insisted that the

decision of the trial court was at least technically erroneous, because the state had adduced *some* evidence of the existence of the nuisance. In our opinion on rehearing (*State v. Order of Eagles*, 100 Kan. 480, 481, 164 Pac. 1063) it was said:

"Perhaps the trial court did err in sustaining defendants' demurrer to the evidence. . . . It would have been better—perhaps it would have been the correct way to end those lawsuits—if the trial court had overruled the demurrer to the state's evidence and had rendered judgment for the defendant on that evidence." (p. 481.)

Passing this phase of the appeal for the nonce, we come to another legal question raised by defendants' demurrer. At no place in the petition did plaintiffs plead an offer to return the property conveyed to them by defendants in the family settlement; and plaintiffs' evidence revealed the fact that they had leased the property to an oil and gas company and were collecting delay rentals thereon. Their own evidence also showed that they had placed a real-estate mortgage for $9,000 on the property, $5,000 of which had been paid off. Apparently there is still an encumbrance on it of $4,000 at least.

Just how plaintiffs intended that these practical barriers of their own making were to be surmounted by an exercise of the equitable powers of the trial court does not appear. Mayhap plaintiffs' failure to plead a tender of return could be waived in view of the recitals of their petition (*Akins v. Holmes*, 89 Kan. 812, 817-818, 133 Pac. 849), but how could equity restore the *status quo ante?* Plaintiffs give no convincing answer to this question. The law books, including our own reports, are replete with statements of the well-known rule of law that when a litigant seeks to rescind a contract he must offer to place his adversary *in statu quo*. Failing so to plead, his pleading is demurrable. Failing so to prove, his evidence is demurrable. (*Beneke v. Bankers Mortgage Co.*, 119 Kan. 105, 237 Pac. 932, and citations; *Springer v. Keller*, 124 Kan. 33, 257 Pac. 964; id., 124 Kan. 369, 259 Pac. 1068, and citations.) In 9 C. J. 1241, it is said:

"In nearly all jurisdictions a bill is demurrable in which complainant does not offer to return any consideration which it shows that he has received, or otherwise place defendant *in statu quo*, or sufficiently excuse himself from that duty. And *a fortiori* is a bill fatally defective where its allegations are such as to preclude the practicability or even the possibility of placing defendant *in statu quo*, as where the bill shows that complainant has conveyed to a third person all the property received by him, or a large part of it, and is therefore unable to make restitution to defendant."

42

In 6 R. C. L. 936 it is said:

"The very idea of rescinding a contract implies that what has been parted with shall be restored on both sides. That one party should be released from his part of the agreement, and that he should be excused from making the other party whole, does not seem agreeable to reason or justice. Hence, the general rule is that a party who rescinds an agreement must place the opposite party *in statu quo.*"

See, also, *Fitch v. United Royalty Co.,* 143 Kan. 486, 55 P. 2d 409.

Other matters appearing in the briefs have been carefully considered, but they are insufficient to affect the result, nor do they justify further discussion.

There is no material error in the record, and the judgment is affirmed.