No. 41,685

THE STATE OF KANSAS, ex rel., WILLIAM M. FERGUSON, Attorney General, *Appellant,* v. THE UNITED ROYALTY COMPANY, a Common Law Trust, *Appellee.*

(363 P. 2d 397)

444

Opinion filed July 8, 1961.

*Ford Harbaugh,* of Wellington, and *George Templar,* of Arkansas City, argued the cause, and *William M. Ferguson,* attorney general, was with them on the briefs for the appellant.

*Kirke W. Dale,* of Arkansas City, argued the cause, and *Donald Hickman,* of Arkansas City, *David W. Carson,* of Kansas City, and *G. C. Spillers,* of Tulsa, Oklahoma, were with him on the briefs for the appellee.

*Roetzel Jochems,* and 84 other unitholders of United Royalty Company, *Emmett A. Blaes, Robert G. Braden, J. Francis Hesse, James W. Sargent, Stanley E. Wisdom, Vincent L. Bogard, Cecil E. Merkel, John W. Brimer, Harry L. Hobson,* and *Bruce W. Zuercher* were on the briefs *amici curiae.*

The opinion of the court was delivered by

Robb, J.: This is an appeal by the state in a quo warranto action from the judgment of the trial court awarded to defendant, and from all rulings, decisions, orders, and findings and conclusions of that court including the overruling of the state's motion for new trial.

On January 11, 1951, the state filed a petition which alleged:

Defendant, the United Royalty Company (hereinafter referred to as United) was a common law trust with its principal place of business at Tulsa, Oklahoma; it had three trustees, one of whom was managing trustee. On August 11, 1922, United was organized as a common law, or express, trust under the laws of Oklahoma for a term of twenty-one years and thereafter entered Kansas where it transacted business as a corporation and has done so continuously ever since without applying for, or obtaining, permission so to do, and without filing the required reports or paying fees and taxes. No approval or authority had been granted to United to engage in business in this state as a foreign corporation under G. S. 1949, 17-501 to 17-503, inclusive.

Defendant has an organization known as a "Massachusetts trust" or "express trust" and is subject to the provisions of the statutes controlling corporations within the state of Kansas and should be required to conform thereto. The life of United had expired by its own trust agreement and it is without right or power to continue any operation. Since 1922 United had transacted business as a corporation and had continuously engaged in buying and acquiring, owning and holding, selling and trafficking in real estate, or interest therein, in Kansas for speculation and profit without any purpose or intention of exploring or developing such real estate for mining purposes

or producing, marketing, or selling the oil, gas, or other minerals · lying in or under such real estate. That while the oil, gas, and mineral leases, and royalty conveyances in Sumner county were but an assignment of interest in and to the oil and gas royalty, United has claimed that such conveyances granted, leased and let to it the interest therein contained for the purpose of mining and exploring for and producing oil and gas and other minerals. The business transacted by United as outlined was not the ordinary business United was organized to do. Such business was unlawful and contrary to public policy and the transactions were and are null and void. The leases and conveyances were obtained for the sole purpose of speculating, selling at a profit, and controlling and preventing development as well as for the further purpose of controlling and preventing the leasing, selling, and alienation of the real estate, and to encumber its record title. Unless United is ousted from the exercise of such corporate power, it will continue such activity in contravention of public policy.

Failure of United to secure a charter or to file the annual reports required by G. S. 1949, 17-702 makes it liable for the penalty imposed by G. S. 1949, 17-705. The exact amount of such penalty is unknown and not readily ascertainable but can be secured and will probably amount to many thousands of dollars.

It was further alleged that the trustees have abused and misused their powers by transacting business in an unsafe, unfair, and dishonest manner and that they have mismanaged United's affairs under the trust agreement and successful operation is impossible and unworkable thereunder.

United secured royalty conveyances from various landowners in Sumner county, and in other Kansas counties, by a document described as a royalty conveyance and gave in exchange therefor certain units in the United common law trust. This conveyance was an interest in land and thereby land titles were clouded which made it impossible for the owner to sell, mortgage, lease, and alienate such property. The giving of units, or shares, in United in return for these conveyances constituted transactions which were unlawful and contrary to the blue sky law and the speculative securities act; they were unlawful, and in direct violation of state statutes and against the public policy, whereby a nuisance was created. Under the 1919 Oklahoma session laws, chapter 16, United could be organized only for a period of twenty-one years and would have no

further power after August, 1943. It had represented to the unit-holders that it was just the same as a corporation in that there was no personal liability to them, which was not true because the unit-holders would be in the same position as are individuals who have not completed organization of a corporation. In past years large debts had been accumulated in Oklahoma, Arkansas, and Texas, for which liability could attach to the unitholders, but in relying on United's representations, the unitholders were led to believe there was no liability. This was a fraud upon the unitholders and the public. Of the 50,000 acres of royalty which United primarily intended to obtain, 16,000 acres were to be around wells being drilled and on structures where wells were about to be started. United did not carry out either one of these purported intentions, as represented and promised, which likewise was against the public interest.

The entire plan had never been carried out nor has there been an attempt so to do. United, in violation of the trust, unlawfully, wrongfully, and fraudulently and without authority turned over to the Liberty Royalty Corporation in excess of $50,000 in cash and over 900,000 units of United together with some of the acquired royalty which was a deliberate violation, abuse, and misuse of power by United. Out of the assets of the trust corpus United was forced to pay $36,000 to the federal government in claims, interest, and penalties for failure, neglect and refusal to pay federal income taxes. The trustees acknowledged in writing that due to difficulty in operating, the trust should be dissolved but that they know of no way to terminate it. This makes necessary the appointment of a receiver to take charge of United's property in Kansas so that it will not be conveyed or transferred to other parties and thus defeat collection of fees and penalties due to the state of Kansas.

It was also further alleged that United has continued to engage in business as a corporation in the state and to enjoy corporate rights without permission or authority of the state and should be enjoined and restrained from so doing and more particularly, from acquiring, trafficking in, or selling any real estate, or interest therein, until final order of the court.

United claimed and collected royalty payments on real estate in divers counties of the state and thus derived royalty payments from the sale of oil and gas produced by others from various tracts of land and United has acquired, held, and now holds such interest as a corporation. If a receiver is not appointed, United, acting as

a corporation, would transfer its holdings outside the jurisdiction of the district court of Sumner county, making necessary a multiplicity of suits in addition to loss of fees, as above stated. The appointment of a receiver would make possible a full determination of the amount United owes the state.

Finally, it was alleged United should be ousted from the state, that its exchanges of units and speculative securities for royalty conveyances should be adjudged null and void, and that United should be permanently restrained and enjoined from carrying on business in the state as a common law, or express, trust.

United answered on September 1, 1951, that it was an express trust organized on August 11, 1922, under the laws of the state of Oklahoma (1949 Supp. Title 60, Section 172) and that the trustees were M. W. Watts, A. B. Rowley, and Samuel N. Brown. United's amended declaration of trust was recorded in the Sumner county, Kansas, register of deed's office on August 25, 1924, and on July 27, 1943, it was further amended to show extension of the trust for twenty-one years after August 11, 1943. The business of United in Kansas is regulated only by the speculative securities act (G. S. 1949, 17-1223, *et seq.*). United was not then and had not been since 1929 and did not intend to become engaged in any activities in contravention of such act. United claimed it was not a corporation organized under the laws of any other state; that it was not seeking to do business in the state as a foreign corporation (G. S. 1949, 17-501, *et seq.*); that as an express trust it was not required to apply for a charter; that it was not required to file annual reports and pay fees (G. S. 1949, 17-702), or penalties (G. S. 1949, 17-705). United was an unincorporated association within the meaning of and as defined by G. S. 1949, 17-2601 (K).

United further stated that the state's interpretation of the statute would be in violation of article 4, section 1, of the federal constitution in regard to giving full faith and credit to the Oklahoma statutes, and enforcement thereof would violate section 1 of the fourteenth amendment of the federal constitution because it would deprive United of its property without due process of law. This action was not one the sovereign state of Kansas is authorized to prosecute in the public interest but is for the benefit of certain individuals, who are unknown to United, but whose individual rights are barred by the statute of limitations (G. S. 1949, 60-306 [*Third*]).

Finally, United expressed its desire to comply with the equitable

orders of the district court or of any other court for the correction of any and all abuses as may be properly, legally, and finally determined.

The 1941 Oklahoma statute referred to in United's answer (Title 60, Section 171) in substance provides that an express trust may be created and empowers the trustees thereof to carry on real or personal property transactions such as United has done ". . . and generally to do any lawful act in relation to such trust property which any individual owning the same absolutely might do." Section 172 states how a trust may be created, the recording of the written agreement, and that the period of existence is not to exceed twenty-one years, or life or lives of beneficiary or beneficiaries. Here it should be noted there was no provision for an extension of the trust.

Section 173 provides for the succession of trustees.

Then section 174 provides that the liabilities of the trust extend to the whole of the trust estate "but no personal liability shall attach to the trustee or the beneficiaries of such trust for any such act, omission or liability." The 1949 Supplement to the Oklahoma statutes, Title 60, Section 172, contains some of the same provisions as did the same section of the 1941 statutes, pertinent parts of which read as follows:

"No such express trust shall be valid unless created first, by a written instrument subscribed by the grantor or grantors duly acknowledged as conveyances of real estate are acknowledged, and recorded in the office of the county clerk of each county wherein is situated any real estate conveyed to such trustee . . . Such express trusts shall be limited in the duration thereof either to a definite period of not to exceed twenty-one (21) years, or to the period of the life or lives of the beneficiary or beneficiaries thereof in being at the time of the creation of the trust . . . the time of the existence of such express trust may be extended for a period of not exceeding twenty-one (21) years at any one time, by a written instrument subscribed by all beneficiaries of such express trust, duly acknowledged as are conveyances of real estate. . . ."

The foregoing provision is the first time an extension of a trust was provided for under the Oklahoma statutes and, as noted, the enactment thereof was subsequent to the amendment of 1943 extending the life of United for an additional twenty-one years.

The agreement of declaration of trust made on August 11, 1922, between C. E. Pochel, Olin Burnham and H. L. Landon, as the original trustees, and the three same named persons as subscribers, showed that 2,000,000 units were to be issued by United for royal-

ties representing an undivided one half interest in 50,000 acres of mineral lands located in several oil bearing states. This was to be strictly a pooling organization. The trustees had neither the right to purchase nor to sell any of the royalties. The trustees agreed to appoint a bank, or banks in each state to act as trustees solely for the purpose of distributing to the unitholders all of the accumulated dividends on the first day of each month. However, before distributions were made all expenses were to be deducted but none were to be deducted until after the pool was declared fully closed. The trustees had absolute control of all monies in the bank. Each and every unit shared equally in the profits of the 50,000 acres. Seventy per cent of the 2,000,000 units were to be issued to the fee owners of the 50,000 acres and the remaining thirty per cent to the trustees for the creation of the pool, and the trustees were to pay all expenses until the pool was declared fully closed. The units were evidenced by negotiable certificates of interest as *cestui que trustent* of no par value in such proportion, kind and amount requested by the landowners. The trustees agreed to hold the property transferred to them together with the proceeds and profits thereof for the benefit of the holders, as stated. It was intended by the parties to create a real trust and not a partnership. All property belonged to the trustees and they were the masters.

The trust would be designated "The United Royalty Company" with three trustees and in case a vacancy occurred from any cause the remaining trustees would fill the vacancy by appointment from the unitholders.

The trustees were to hold the legal title to all property, to exercise exclusive management, to assume all contracts for obligations and liabilities in connection with all things of value assigned to them but were not to be personally liable. The subscribers or any persons associated or acting with them were to be held harmless and indemnified from and against any loss, cost, expense, or liability of the trust. They used a common seal. They could collect, sue, receive and receipt for all monies and could employ counsel, prosecute, defend and settle lawsuits.

Then followed provisions regarding stated meetings and other matters with which we are not presently concerned and will not now discuss.

The trustee could elect officers with the authority and duties usually incident *to like officers in corporations* and determine the

duties thereof, fix the compensation of such officers, agents or servants they employed ". . . and are likewise authorized to pay themselves such compensation for their services as they may deem reasonable."

The trustees were not liable for errors in judgment, which were made in good faith, or for acts or omission of each other or of any officer, agent, representative, or servant and were not obliged to give bond to secure the due performance of the trustees. In case of loss or destruction of certificates or units, the trustees could issue new certificates to replace them. The annual meeting of the unit-holders was to be held in Newkirk, Oklahoma, with special meetings held upon ten days' notice. At all meetings unitholders were entitled to one vote for each unit held by them and vote could be by proxy. Only business set out in the notice could be transacted at a special meeting and a majority of all the units had to be present, in person or by proxy, at any meeting in order to transact business. The ownership of units did not entitle the holder to any title in the trust property or right to call for partition or division of the same, or for an accounting or any control of the trust property. The trustees could not bind the unitholders personally. Creditors of the trust could look only to the fund and property of the trust for payment so that neither the trustees nor the unitholders, present or future, would be personally liable for debt, etc. The trust was to be continued for twenty-one years when the trustees could wind up its affairs, liquidate the assets, and distribute them among the unitholders, or if at least two thirds of the units should vote to continue the trust, it could be continued in existence for a further like period, or such shorter period as may then be determined.

The state's reply recited a change in personnel of the trustees. It admitted the correctness of the contents of the Oklahoma statute but expressly denied that United is now in legal existence. The state admitted United's organization, that the declaration of trust constituted United as an express trust and admitted the recording thereof, but expressly denied the extension of the term of United for an additional twenty-one years and further expressly denied that it was then in effect or in lawful existence and finally set out a general denial.

The Oklahoma statutes and the trust agreement, as heretofore narrated in brief, were stipulated by both parties to be correctly stated. At the time of trial it was stipulated:

The trustees were M. H. Watts, Lillian Bowlby, and Mr. Houston; United had not qualified to receive a permit to do business as a foreign corporation in Kansas; no annual reports had been made to the secretary of state and no annual fees paid as a foreign corporation; no penalty had ever been paid to the state by United as a foreign corporation; United issued units represented by certificates to landowners for mineral interests in Kansas and a depository had been maintained in the Progressive State Bank (later the State Bank) of Winfield until 1929; United had collected any and all money due under the mineral conveyances affecting Kansas land; the general method of operation was the same in Kansas and six other states; so far as known, United had never obtained a permit from the speculative securities department of the state to issue its certificates; when this action was filed United had 14,234.51 acres of royalties in the several states; the amendment to the declaration of trust to extend its existence was not signed by all the beneficiaries but was made in accordance with the provisions in the declaration of trust since the Oklahoma law was silent in regard to extensions in 1943; the trustees as such received no salary but were paid expenses except M. H. Watts, the managing trustee, who was given a monthly allowance as salary for the work, labor and services rendered by him in looking after the company's business. This allowance came out of the trust income. If the court finally determined that the trust owed the state any taxes, interest, and penalties, the trust would voluntarily pay them.

Article 12, section 6, of our state constitution provides:

"The term corporations, as used in this article, shall include all associations and joint stock companies having powers and privileges not possessed by individuals or partnerships; and all corporations may sue and be sued in their corporate name."

Under the contention of United that it is an unincorporated association, we note that G. S. 1949, 17-2601 (K), a section of the general corporation code, reads:

"'Unincorporated association' means any group of two or more persons united to carry on a business for profit except when such group is formed into a corporation under the laws of any state, territory, nation or sovereignty. Without hereby restricting the meaning of the term it is declared to include partnerships, limited partnership associations, joint-stock companies, so-called common-law trusts or Massachusetts trusts and all other business trusts."

The findings of the trial court were extensive and only those pertinent to the determination of this appeal will be discussed.

The court found that United was not a corporation organized, created by or formed under the laws of any state or sovereignty; that when organized its prinicipal place of business was New-kirk, Oklahoma, and since 1933 has been in Tulsa, Oklahoma; that M. H. Watts was the managing trustee and Ruth Stewart was secretary. On August 11, 1922, a declaration of trust was executed by C. E. Pochel, Olen Burnham and H. L. Landon as subscribers and also as trustees, and the declaration was recorded in the office of the county clerk of Kay county, Oklahoma, on October 14, 1922, and was filed of record in Sumner county, Kansas, on August 25, 1924.

The court further found:

"The trustees proposed to unite the undivided one-half of the oil, gas and mineral rights of the fee owners of 50,000 acres of the several oil bearing states into a strictly pooling organization; *the trustees had absolute control of all moneys deposited in banks designated to receive and prorate same*, to withdraw the moneys from said banks and to appoint other banks to act in a like capacity as the best interests of the trust might appear; the fee owners of the land placed in the pool were to be issued 70% of 2,000,000 units to be issued by the trustees and the trustees were to be issued 30% of the said units for uniting the fee owners but all expenses of uniting and assembling said pool were to be paid by said trustees until the 50,000 acres were obtained or until the pool was declared closed; each and every unit was to share equally in the profits of the 50,000 acres; the title to the property acquired was to be held by the trustees as trustees and managed by them for the holders of the units; the instrument created a *real* trust and not a partnership; the trustees collectively were to be designated as The United Royalty Company, so far as practicable, and conduct all business and execute all instruments under that name; the trustees were to hold the legal title to all trust property together with the exclusive management thereof; they assumed all liabilities as trustees but none personally; the trustees were to hold the subscribers, and all persons acting with them, harmless against any and all liability; the trustees could adopt, alter or repeal any and all by-laws, rules and regulations not inconsistent with the Declaration of Trust; the trustees were authorized to elect officers having authority similar to those of corporations; the trustees were not liable for errors of judgment, acts or omissions to act; the units were to be of no par value; the trustees were to issue each unit holder a negotiable certificate as evidence of the ownership of such units but total units issued were not to exceed 2,000,-000; the trustees were to hold office for the duration of the trust but, in case of death or resignation, the vacancy was to be filled by the remaining trustees; the death of a unit holder or trustee did not terminate the trust; the ownership of units did not entitle the owner to any title in trust property or to a division or partition thereof; the trustees could not bind the unit holders personally; creditors of all kinds were required to look to the trust property and no trustee or *unit holder was personally liable to any creditor*; the trust was to continue for 21 years from the date thereof at which time the Trustees were to wind up

its affairs, liquidate the assets and distribute same prorata among the unit holders but, if prior to said 21 years period, the holders of at least ⅔ of the units then outstanding should vote, at a meeting called, to terminate or continue the trust, then said trust was to be terminated or should continue in existence for a further like or shorter period as said vote determined.

"XI

"The intent and purpose of the said subscribers and trustees was to establish a co-operative pooling of minerals in place among land owners so that one could profit from any oil and gas under the land of the others whether in Kansas or elsewhere; the landowners were the holders of the units issued them in exchange for the mineral interest placed by them in said pool and *each land owner received his proportionate part of the proceeds from production on the land of all other land owner members of the pool or trust.*

"XII

"The certificates originally issued the land owners were negotiable and a *great proportion* of the original units are now in the hands of third parties through sale or death by and of the original land owners, their heirs and assigns.

"XIII

"United Royalty acquired a total of 51,386.46 acres of an*d* undivided ½ interest of the oil and gas mineral rights of the fee owners in lands in the several oil bearing states and in excess of said undivided ½ interest in the proposed 50,000 acres."

. . . . . . . . . . . . . .

"XV

"Oil in paying quantities was first discovered and produced from acreage in the block or pool belonging to the defendant in 1924; such production has been continuous at all times since and is so at this time.

. . . . . . . . . . . . . .

"XVII

"At the time of the trial, United Royalty had 44 producing properties in Kansas and its income was running on an average of about $4,000.00 per month.

"XVIII

"United Royalty has executed 3 oil and gas leases upon land in Kansas in its mineral interest pool and, in each of these lands, United Royalty owned a full participating mineral interest.

"XIX

"United Royalty owns no real estate in Kansas except the mineral interests in its pool, *have* never engaged in buying and selling real estate and *has never engaged in any activity in Kansas except the exchange of its units for mineral interests during the time its mineral interest pool was being assembled;* United Royalty owns 8,000 acres of mineral interest in Kansas which are a part of the mineral interest pool. The securing of mineral interests from land owners to be placed in the mineral interest pool of United Royalty terminated in 1929 and no such conveyances have been taken in Kansas since that year."

Finding 20 set out the Oklahoma laws, which have already been

summarized, and finding 21 first set out the 1947 amendments to the Oklahoma statutes and then concluded as follows:

"Prior to the year, 1947, the Oklahoma statutes did not provide for an extension of a trust organized thereunder *nor did they prohibit any extension thereof as might be expressed in the trust agreement.*"

Findings 22, 23, and 24 related to the calling of a special meeting of the unitholders held on July 27, 1943, the notice given, and the vote on the extension of the trust for twenty-one years which showed that more than the required two thirds of the units issued and outstanding voted in favor of extending the term of the trust.

Finding 25 sets out the fact that each unitholder was mailed notice of the action taken on July 27, 1943, extending the term of the trust.

Finding 26 states that as of July 1, 1957, the sum of $102,000 had been disbursed to the several unitholders after the extension of the trust on August 11, 1943.

It was finally found:

"XXVII

"United Royalty has received 503 original conveyances from the land owners who placed mineral interest in and under land owned by them into the said mineral interest pool.

"XXVIII

"Many of the units issued to the original land owners have been sold and transferred by the holders thereof and are now owned by the respective purchasers or their assigns.

"XXIX

"All other facts are found generally in favor of the defendant, United Royalty Company."

The trial court's conclusions of law were as follows:

"1. The defendant, United Royalty Company, is not and has never been a corporation organized or formed under the laws of this or any other state, territory, nation or sovereignty.

"2. The defendant is authorized to do any lawful act in relation to its trust property which any individual owning the same might do; does not, as an association or joint stock company, have any powers and privileges not possessed by individuals or partnerships and hence is not a corporation within the meaning of Article 12, Section 6 of the Constitution of the State of Kansas.

"3. The defendant, United Royalty Company, is and has been since the enactment of Sec. 17-2601 of the General Statutes of Kansas, 1949, an unincorporated association as defined by said section and sub-division 'K' thereof.

"4. The defendant, United Royalty Company, is not required to make application to the State Charter Board for authority to engage in business in this state as a foreign corporation or make the annual reports and pay the fees owing by said foreign corporations doing business in this state and is not sub-

ject to the penalties imposed upon said foreign corporations for failure to do so.

"5. The defendant, United Royalty Company, has not violated and is not required to obtain a permit for the sale of speculative securities in Kansas and is not subject to and has not violated the provisions of G. S. 1949, Chapter 17, Article 12 cited as the Kansas Securities Act and commonly known as the Kansas Blue Sky Law.

"6. The Declaration of Trust and the life of the Trust was legally extended for a period of 21 years from 'August 11, 1943, and is now in full force and effect.

"7. The Plaintiff is not entitled to the relief sought and should have and recover nothing. The defendant should be awarded judgment for its costs.

"8. Proper journal entry should be prepared by counsel for the defendant and submitted to counsel for plaintiff for approval and then to this Court for his signature, and thereupon entered upon the journal of the court."

This case was meticulously tried by very able counsel on both sides in the court below and the record presented for appellate review contains voluminous documentary evidence and in addition there is testimony of numerous witnesses, some of which is contradictory and some undisputed. Once a trial court has made findings of fact which are supported by any substantial evidence, this court on review will not disturb such findings even though the evidence may be conflicting. (*In re Estate of Cox*, 184 Kan. 450, 453, 337 P. 2d 632; *Renner v. Monsanto Chemical Co.*, 187 Kan. 158, 168, 354 P. 2d 326.) However, we have stipulated and undisputed facts, as well as documentary evidence, which are as much before this court on appeal as they were before the trial court, and their sufficiency becomes a matter of law for our determination rather than purely a question of fact for the sole determination of the trial court. (Dassler's Kansas Civil Code, supp. ed., ch. 92, § 24, p. 856.)

The most important, prime, and basic evidentiary element in this case is the declaration of trust relied upon by United. It was admitted upon the filing of the reply by the state that this trust agreement was the core and life-giving instrument that brought United into existence.

In May, 1923, approximately eight months after the trust agreement was executed, United filed an application with the Kansas blue sky department, which was then under the jurisdiction of the state bank commissioner, to which was attached copy of the declaration of trust. On May 9, 1923, that department submitted United's application to the attorney general for his written opinion. On June 28, 1923, United wrote the state bank commissioner requesting knowledge as to what had been done in the consideration

of its application and what its future status in the state was to be. On June 29, 1923, the blue sky department informed United by letter that the attorney general had handed down his opinion that United's proposition clearly came within the provisions of the blue sky law of Kansas and that United should send $250.00 to defray the expense of a necessary investigation of the company and its holdings by a personal representative of the blue sky department.

On April 27, 1923, United appointed the Progressive State Bank of Winfield, Kansas, as trustee to distribute funds to unitholders according to the declaration of trust on file in the Cowley county register of deed's office. On November 26, 1923, a receipt for $25.00 was issued by the bank commissioner's office for a filing fee under chapter 164, session laws of 1915 (now G. S. 1949, 17-1223, et seq.)

On November 27, 1923, United was informed by the state bank commissioner's office as follows:

"William Howe leaves today for inspection of your holdings."

On November 30, 1923, Mr. Howe made a report to the bank commissioner's office to the effect that after a farmer leased his land for oil and gas to any oil company he preferred, he put his royalty into the pooling company (United) which took 30% of such royalties it received for compensation. After deducting the 30%, the balance was divided equally among the intended 312 members of the pool. There was no buying or selling of leases or stock and Howe could see no way of any harm the company could do anyone as a result of fraud.

On December 21, 1923, C. E. Pochel sent two letters wherein he undertook to explain the plan and purpose of United, which we do not believe need be repeated here because they are not particularly helpful. Apparently nothing more happened until May 22, 1928, when the state bank commissioner's office wrote United and informed it that information had reached that office that United was offering stock in its company in Kansas, and it was in violation of our penal statutes to sell such stock without first obtaining a permit. In reply thereto on May 25, 1928, United by and through O. P. Burnham, as secretary, again wrote a long letter to the bank commissioner explaining the intention and purposes of United which we shall not set out in detail. On May 26, 1928, the state bank commissioner's office informed United of the receipt of its letter of explanation and requested copies of the conveyance of the

oil royalties, printed contracts, and other printed material, and mentioned the investigation of similar propositions as well as the pendency in the Supreme Court of the State of New Mexico of a suit brought under their blue sky law which was almost identical with ours.

Before discussing the principal issue, mention should perhaps be made of the most recent appearance of United as a litigant in this court. In 1955 United, as an Oklahoma express trust, had its title quieted to an interest in the mineral rights in and under certain lands in Ellis county (*Froelich v. United Royalty Co.,* 178 Kan. 503, 509, 510, 290 P. 2d 93) and in an opinion on rehearing (*Froelich v. United Royalty Co.,* 179 Kan. 652, 297 P. 2d 1106) the interest was more particularly determined to be an undivided one half interest in and to the minerals in place in and under the land involved. (p. 655.) Thus it was established under the terms of the trust that United had obtained and would retain title to real estate in Kansas whereby it would sign leases and division orders, and receive income from oil and gas produced from such real estate.

Did the trust agreement indicate United had the powers and privileges of a corporation? The agreement exempted the trustees and the unitholders from any and all personal liability. The trustees were the masters of every element of the trust to the exclusion of the unitholders who had only voting rights based on the representation afforded by the number of units owned. The agreement contained no element of joint tenancy, or tenancy in common, and no provision for dissolution of the trust except the expiration of the term for which it was organized or any extension granted under the provisions therefor. The trustees elected one of their number who signed as president and another member who signed as secretary. A common seal was adopted. All of the above are indicative of powers of a corporation in Kansas since individuals and partnerships do not possess such powers in conducting their business affairs.

While the trial court in its findings of fact did not in specific language find the trust had the powers and privileges enumerated above, they were substantially so found. Notwithstanding these findings, the trial court concluded, as a matter of law, that United did not possess such corporate powers and privileges. The inconsistency between the findings and conclusions, and more specifically between finding 10 and conclusion 2, serves to emphasize that the

principal issue in this case yet to be decided is whether United is a corporation as such is prescribed by the constitution and laws of the state of Kansas and whether, as such, it is amenable to the requirements and exactions thereunder.

Some of the appropriate opinions of this jurisdiction are: *Lumber Co. v. State Charter Board*, 107 Kan. 153, 190 Pac. 601, a landmark case, wherein the trust agreement was almost the same as the agreement in our present case. It was held that an unincorporated company was a corporation within the meaning of article 12, section 6, of our state constitution, and this court enumerated in considerable detail how the plantiff therein was proposing to exercise powers and privileges not possessed by individuals or partnerships:

"There is first the limited liability under which both shareholders and trustees are exempted from all personal liability. The corpus or joint property is to be continued during the existence of the trust freed from the rules of joint tenancy or tenancy in common, and the organization is not dissolved by the death of a shareholder or trustee. The interest of the shareholder is represented and measured by negotiable shares of stock which give voting power much the same as does corporate stock. A common seal is to be adopted and used substantially as is done by corporations, and the trustees 'may elect officers who shall have the authority and duties usually incident to like officers in corporations.'" (p. 160.)

In *Harris v. Oil Co.*, 110 Kan. 532, 204 Pac. 754, a Massachusetts trust, or voluntary trust, was held to be a corporation and the court, in adhering to the ruling in the foregoing Lumber Company case, stated:

"A regular session of the legislature has since been held without making any change in the law as so interpreted. This implies legislative acceptance of the policy of regulating organizations such as the defendant and gives room for the presumption that if the existing law had been otherwise interpreted such regulation would have been provided by new legislation—a special reason why the decision should not be overturned except upon the strongest grounds." (p. 533.)

In the Harris case it was further suggested that such a trust enjoyed practically all the advantages of ordinary corporations and no reason is apparent why they should not be subjected to the same obligations and regulations. (p. 535.) This very appropriate reasoning appeared later in the opinion:

"If the defendant is the kind of an organization to which the Kansas constitution and statutes apply the name corporation and upon which they impose certain regulations, it is wholly beside the purpose that the Minnesota constitution and statutes do not apply that term to it and do not impose such regulations upon it . . . All that is presently necessary is to decide, as

we do, that such an organization may be a nonresident of this state and as to it a foreign corporation—that is to say, not a corporation within the meaning of the law of some other jurisdiction, but an association known to our statutes as a corporation which is not a resident of this state." (p. 537.)

By substituting the name *United* for defendant and *Oklahoma* for Minnesota, the above statements are found to be applicable to our present situation.

*Weber Engine Co. v. Alter,* 120 Kan. 557, 245 Pac. 143, 46 A. L. R. 158, anno. 169, raised the question as to whether a Massachusetts trust, or a business trust, could transact business in the state of Kansas without a corporate license. It approved and adopted the rule of the Lumber Company case and cited many others from foreign jurisdictions. The opinion, in explaining the reason for the rule approached the proposition in a little different way, as can be seen from the following excerpt:

"As compensation for their privileges, corporations have substantial burdens to bear. For instance, they are subject to supervision by the state; they pay fees for incorporation; they make detailed reports to the state, and pay special taxes. In return, the state has given to their shareholders the privilege to engage in business without personal liability, provided they comply with the corporate law in the organization and conduct of the business. The law is strict concerning them. It requires an accurate statement of the capital, the recording of the articles, and safeguarding of the public in its dealings with them in various ways. It requires proof that the capital of the corporation has been paid in before it is permitted to do business. It provides means by which those who purchase stock therein may know that the proceeds of the purchase go into the capital of the company. It discloses a policy designed to protect the public against loss in the transaction of business with them. These purposes of the law may be circumvented if associations of the kind under consideration are permitted to secure exemption from personal liability for their membership without compliance with the provisions of law. Such a situation was never contemplated. It is contrary to the intent of our constitution and laws." (p. 562.)

Close on the heels of the Weber case was *Linn v. Houston,* 123 Kan. 409, 255 Pac. 1105, concerning a common law trust. The rule in the Weber case was approved and applied.

The court in *Ward v. Home Royalty Ass'n,* 142 Kan. 546, 50 P. 2d 992, stated that when an Oklahoma common law trust which received a Kansas landowner's deed through the mail and in return therefor mailed to the landowner a certificate of participation in net income of the trust, such certificate was a speculative security within the meaning of the blue sky law of this state, the trust had no permit to sell or dispose of such speculative security in Kansas, and this court therein held:

". . . *use of the certificate, without a permit, for the purpose for which it was used was illegal,* notwithstanding the fact that power to regulate interstate commerce is conferred by the constitution of the United States on congress." (Syl.) (Our emphasis.)

See, also, the well-reasoned opinion in *Wigington v. Mid-Continent Royalty Co.,* 130 Kan. 785, 288 Pac. 749, which was mentioned in *Fitch v. United Royalty Co.,* 143 Kan. 486, 493, 55 P. 2d 409, the first case in which United appeared before this court. The syllabus in the Fitch case read:

"Plaintiff conveyed an oil-and-gas royalty interest in certain land to a common-law trust domiciled in Oklahoma, which held no permit to deal in speculative securities in Kansas. As consideration for his conveyance he received unit interests in the trust estate and his proportionate share of the profits distributed by the trust from time to time for more than four years. *Held:* (1) the common-law trust had legal capacity to acquire a royalty interest in plaintiff's land; (2) plaintiff's long acquiescence in the transaction, his acceptance and retention of the benefits of the transaction, and the subsequently attached rights of third parties, interveners, whose respective interests in the trust estate would be prejudicially affected, rendered it altogether inequitable to set aside the deed and quiet plaintiff's title to the royalty interest he had conveyed to the common-law trust."

While our present question was fully discussed and determined in the Fitch case, it can be seen from the above-quoted syllabus that the court did not decide the Fitch case thereon but on the element of laches, but in following the Lumber Company case and the Linn case, both *supra,* it was actually held that United was in truth and in fact a corporation notwithstanding its failure to perfect its organization as such under G. S. 1949, 17-1223, *et seq.* (pp. 490, 492, 494.)

United contends it has not carried on any business in Kansas since 1929. However, in view of the situation presented in the Fitch and Froelich cases, we cannot accept this as true, and in addition, from the inception of the trust the principal purpose thereof was the income to be received from the production of minerals from the mineral interests held by United. The obtaining of the mineral deeds in exchange for certificates of units was just a preliminary step in the plan of operation. To contend seriously that there is no further benefit to be derived from the trust agreement would appear to be taking inconsistent positions in the controversy.

In view of the fact that United is a corporation under article 12, section 6, of our state constitution, it is not necessary to repeat all the specifications of error presented by the state. The only question

left is should a writ be issued ousting United from doing business in the state, or should this court, under the circumstances, give United an opportunity to comply with our corporation laws, along with the making of such orders as are necessary to assure such compliance. The state has presented a very strong case in support of its request for the ouster of United from doing business in Kansas, for the appointment of a receiver, and a winding up of the business. However, we have a duty to be mindful that quo warranto is an extraordinary remedy and should only be used in extreme cases and where it is the only method available to protect the public.

On the other hand, if more benefit to everyone concerned may be realized by something less than quo warranto, courts in the exercise of their judicial discretion should resort thereto. We conclude that in the best interests of justice and equity it will be proper to require United to comply with the state corporation code, and more particularly with G. S. 1949, 17-702 so that fees, taxes, and any penalties may be determined and paid.

United is permanently enjoined until such time as it has complied with the requirements of the blue sky law and of the provisions of the state corporation code, more particularly, G. S. 1949, 17-702, and a final settlement of any and all monies owing from United to the state of Kansas is made and amounts due paid; it is enjoined further from in any way disposing of any or all of its property, real, personal, or mixed, that is located within the state of Kansas. By reason of the above, the trial courts judgment is reversed and the cause remanded with directions to proceed further according to the views expressed herein.

Reversed and remanded with directions.

FATZER, J., not participating.