**INSIDE SCOOP, INC., Plaintiff,**

v.

**Paul CURRY, et al., Defendants.**

**Civ. A. No. 84–3372.**

United States District Court,
District of Columbia.

Sept. 19, 1989.

Andrew D. Shapiro, Arlington, Va., James A. Frieden, Garrity & Frieden, Boston, Mass., for plaintiff.

Andrew R. McCorkle, Andrew J. Reinhardt, Washington, D.C., Vincent J. Pisegna, Boston, Mass., for defendants.

## OPINION

JUNE L. GREEN, District Judge.

Plaintiff seeks to collect monies due on a promissory note. Defendants Paul F. Curry and Philip M. Katz failed to answer the complaint so a default judgment was entered by the Clerk on June 12, 1985, in the amount of $189,196.00.

In its memorandum and order dated July 19, 1988, the Court granted defendant Philip Katz' motion to vacate the default judgment. Defendant Katz, individually, is the only defendant before the Court at this time. A trial to the court followed, with both parties filing their closing arguments.

For the reasons stated below, the Court finds in favor of defendant Katz.

## I. *Findings of Fact*

Plaintiff, Inside Scoop, Inc., is a corporation organized under the laws of the District of Columbia. Defendant Katz is a citizen of Massachusetts and was one of two trustees of C & K Investment Trust–Washington 1 ("Washington 1") and C & K Management Trust, with Paul Curry as the other trustee. Both trusts were known commonly as "Massachusetts business trusts."

Defendant Katz was also a trustee of numerous business trusts other than Washington 1 and the Management Trust, located in the District of Columbia, Maryland and Massachusetts, for example:

C & K Investment Trust–Harvard Square

C & K Investment Trust–Faneuil Hall

C & K Investment Trust–Atlantic City

C & K Investment Trust–Georgetown

C & K Investment Trust–Tremont Street

C & K Investment Trust–College Park, Maryland

C & K Investment Trust–University City

C & K Investment Trust–Dupont Circle

C & K Investment Trust–Washington Street

Joint Ex. 7 at 19. The Management Trust provided management and administrative services to all of the separate investment trusts. For these services, each investment trust was to pay 5% of the gross sales proceeds. No other fees were to be incurred. *Id.* at 16 & 17. Katz and Curry made all of the decisions for each of the trusts. Transcript Vol. III at 110, lines 2–4. They were the sole shareholders as well as trustees for the Management Trust.

The Declaration of Trust for Washington 1 was filed with the Corporation Division of the Secretary of State in Massachusetts on May 23, 1983. *See* Joint Ex. 6. Under Article XI of the Declaration of Trust entitled "Recording," the trust provides that the "Trustees shall record this instrument in the Registry of Deeds for Norfolk County, Massachusetts, and shall also file a copy in the office of Secretary of the Commonwealth and Clerk of Wellesley." *Id.* While filed in the Secretary's office, the instrument was not filed in Norfolk County or in Wellesley. *See* Plaintiff's Exs. 110 & 111.

In May 1982, Inside Scoop leased property located at 1134 19th Street, N.W., Washington, D.C. from Giobatta Corrado Bruzzo ("Landlord")[1] under a three-year lease with seven and five-year options (the "lease"). *See* Joint Ex. 2. Inside Scoop operated an ice cream store under the same name at this location in 1982 and 1983. Transcript Vol. I at 69.

In November 1983, defendant Curry contacted Inside Scoop's officers, Jerrold Klein and Andrew Shapiro. Defendant Curry was interested in opening a "Steve's" ice cream store at the Inside Scoop location. He explained that he and defendant Katz, through the C & K Management Trust, operated several "Steve's" ice cream stores. Transcript Vol. I at 72. While they had an option on the building next door at 1136 19th Street, Curry stated that he would prefer Inside Scoop's location due to lower construction costs. *Id.* at 78.

The parties came to a tentative agreement to assign the lease and to sell certain leasehold improvements to Curry and Katz' company. The agreement was put in writing in a letter dated December 2, 1983. Joint Ex. 9. The agreement provided for the assignment of the lease to occur on January 1, 1984. Washington 1 was to:

1) pay all rent directly to the Landlord;

2) pay $50,000 for the leasehold improvements;

3) purchase Inside Scoop's leasehold interest for the total sum of $335,416.65, to be paid in monthly installments of $2,083.33 (which included 9% interest) through May 1, 1997, with the first six installments paid up front; and

---

**1.** He was joined by Harry C. Perry, Jr., as sole trustee for the Giobatta Corrado Bruzzo, Jr., Trust and the Debora Caterina Bruzzo Trust, both trusts established under the Will of Maddalena Maria Bruzzo.

4) purchase Inside Scoop's security deposit upon default or termination of the lease, whichever occurred first.

Also included in Paragraph 4 of this letter was an agreement to secure the purchase of the lease:

To secure the Trust's obligation to make the payments described in Paragraph 3 above, the Trust will, on December 7, 1983, execute and deliver to [Inside Scoop] a collateral assignment of lease which will provide that in the event the Trust defaults in making such payments or fails to comply with the terms of the lease, [Inside Scoop] will have the right to retake possession of the lease premises and the leasehold improvements and receive immediate payment of the unpaid balance of the Trust's obligation under Paragraph 3.

*Id.* This letter was signed by defendant Curry as "Paul F. Curry, Trustee, C & K Investment Trust–Washington 1."

The transactions between Inside Scoop and Washington 1 closed on or about December 9, 1983. Inside Scoop executed both the seven and five-year options on the lease and, along with the Landlord, agreed to certain amendments to the lease. Joint Ex. 16. Inside Scoop assigned all of its rights under the lease to Washington 1 and Washington 1 assumed all of Inside Scoop's obligations under the lease, including rent payments. Joint Ex. 18.

In addition to the assignment of the lease, Washington 1 executed a Purchase Money Note (the "Note") which represented the payment for the sale of the lease to it. The Note was executed on December 9, 1983, including the principal amount of $194,362.00, together with simple interest at the rate of 9% per annum. A six month advanced payment of $12,500 was to be paid on December 9, 1983, with the remaining payments of principal and interest at $2,083.33 to be paid on the first of every month beginning on July 1, 1984 and continuing through May 1, 1997. The Note also provided that:

overdue payment of interest and/or principal, together with the late charges thereon (whether in due course or after

acceleration of maturity as herein provided for) and all sums advanced or expended by the holder for the Maker's account pursuant to the Collateral Agreement shall bear interest at the rate of eighteen (18%) per annum ... (hereinafter, the "Default Rate") until paid.

Plaintiff's Ex. 2 at 2. The Note is to be construed in accordance with the laws of the District of Columbia, while the Declaration of Trust of Washington 1 is to be construed under the laws of the Commonwealth of Massachusetts.

Washington 1's obligations under the Note were secured by a Collateral Assignment of Lease. Upon default, Inside Scoop was entitled to reoccupy the property and "to declare all [i]ndebtedness to be immediately due and payable." Joint Ex. at 6. Both the Note and Collateral Assignment were signed by defendant Katz as "Philip M. Katz, Trustee."

Two additional transactions occurred but were not included in plaintiff's complaint. Another note was executed that represented the security deposit for the lease and plaintiff sold the fixtures to Washington 1 for $50,000. *See* Plaintiff's Ex. 3 and Joint Ex. 14.

Washington 1 began doing business as "Steve's Homemade Ice Cream" in January 1984. It paid the advance six months payment under the Note and the payments for July, August and September 1984. Transcript Vol. I at 137, lines 22–24. No further payments were received by plaintiff. *Id.* at 138–39. Washington 1 also failed to make rent payments to the Landlord after July 1984.

When plaintiff did not receive the October 1984 payment, Mr. Shapiro sent a letter to defendant Curry on October 14, 1984, informing him that Washington 1 was in default for nonpayment under the Note. Joint Ex. 35. He gave Washington 1 an additional five days to make the payment and avoid the consequences of default. Plaintiff never received any response from Washington 1. Transcript Vol. I at 139.

Early in November 1984, Mr. Shapiro observed that the store had been closed

and appeared to be abandoned. *Id.* at 139-40. Washington 1 failed to give any notice of vacating the premises. *Id.* at 141. As Mr. Shapiro testified, the "place had been trashed." *Id.* at 140. Garbage, consisting of papers and food, was all over the store. A faucet had been removed from the sink, the freezer lids had been taken off and the walk-in freezer was damaged. *Id.* Tile from the wall was gone and shelving was missing. The outer wall was damaged and the ceiling needed repair. *Id.* at 142. The HVAC unit also needed repair. *Id.* at 143. Washington 1 had left the store in a complete mess.

Inside Scoop reentered the premises, made repairs and reopened the store as a "Steve's" ice cream store. After an apparent misunderstanding about the appearance of a "Steve's" going out of business and the reopening of the store, Steve's Ice Cream, Inc. filed a complaint seeking injunctive relief for trademark infringement. As a result, the parties settled two months later and plaintiff removed the "Steve's" sign from the store. *Id.* at 145.

Thereafter, plaintiff sought to rent the premises. In March 1985, Inside Scoop sublet the premises for the remainder of the lease term to the 19th Street Deli, Inc. ("Deli") at $4,000 per month. *Id.* at 161; *see also* Joint Ex. 36. This was about $1,177.00 above the lease rent of $2,823.00.

By January 1987, the Deli was behind substantially in its rent to Inside Scoop. In February 1987, Mr. Chang Choi paid $30,000 on behalf of the Deli to repay the back rent that had accrued, and took over the Deli's sublease. Transcript Vol. I at 172, lines 17–23. By January 1988, however, Mr. Choi owed a large amount of back rent. He abandoned the premises and Inside Scoop reentered. *Id.* at 175–76.

On or about February 1988, the Landlord and Inside Scoop negotiated a termination of the lease. The Landlord paid $20,000 to the Century National Bank on behalf of plaintiff to remove liens it had on the fixtures in the store and released Inside Scoop from back rent owed in the amount of $32,985.43. *See* Joint Exs. 47 & 48. Plaintiff released any rights it had in the security deposit.

During the period after Washington 1's default, plaintiff received $118,050 in income from all of the sublettors, including the $20,000 from the Landlord. *See* Plaintiff's Ex. 11A. Plaintiff expended $113,002.61 in rent, repairs, advertising and some attorney fees.

Plaintiff filed its complaint initially on November 5, 1984, seeking recovery on the Note. Plaintiff sought judgment from defendant Washington 1, and defendants Curry and Katz, individually and as trustees of Washington 1. Only defendant Katz is before the Court at this time.

## II. *Conclusions of Law*

A Massachusetts business trust is an unincorporated organization operating under a written instrument or declaration of trust. Trustees manage the property for the benefit and profit of persons whose legal interests are represented by transferable certificates or shares. *See* Mass.Gen. Laws Ann. ch. 182, § 1 (West 1987); G. Bogert, *The Law of Trusts and Trustees*, § 247, at 146 (rev. 2d ed. 1977); Annotation, *Modern Status of the Massachusetts or Business Trust*, 88 A.L.R.3d 704, 711 (1978).

A business trust differs from a conventional trust in the manner of its creation and in its purpose. While a conventional trust usually arises from a gift or grant of the settlor of the trust in order to conserve and protect the property of the trust, a business trust is created when investors pool their resources in a contractual relationship with the trustees for the purpose of making a profit. Bogert § 247, at 147; 88 A.L.R.3d at 712.

The Massachusetts business trust enjoys many of the same benefits as a corporation, without the statutory burden of actual incorporation. The business trust's origin in Massachusetts has been attributed to the fact that corporations were prohibited from developing or dealing in real estate. Bogert § 247 at 150. The business trust form was also used to avoid the payment of taxes and fees required of corporations

while still securing limited liability for the members of the trust, to avoid the "blue sky" laws, or to avoid the requirements imposed on foreign corporations. *Id.* at 151. Many states have enacted statutes subjecting business trusts to the same requirements as corporations and the Internal Revenue Service treats business trusts as corporations for taxation purposes.

Some jurisdictions recognize the business trust form by statute. *See, e.g.,* Ariz.Rev. Stat.Ann. §§ 10–501 to 10–509 (1977 & Supp.1988); Fla.Stat.Ann. §§ 609.01 to .08 (West 1977); Mass.Gen.Laws Ann. ch. 182, §§ 1–14 (West 1987); W.Va.Code §§ 47–9A–1 to –6 (1986). For a more complete compilation, see Bogert § 247 at 137 n. 98. The District of Columbia neither provides for business trusts nor makes any reference to this type of business form by statute.[2]

Some states, due to their definition of corporation, have treated business trusts as corporations, requiring the trusts to incorporate before doing business in the state, or have held business trusts subject to the statutes regulating foreign corporations. *See, e.g., Rubens v. Costello,* 75 Ariz. 5, 251 P.2d 306 (1952); *State ex rel. Ferguson v. United Royalty Co.,* 188 Kan. 443, 363 P.2d 397 (1961).

Other states have treated alleged business trusts as partnerships, applying the "control" test. If the trustees have the exclusive right to manage the business free from the control of the shareholders, and possess legal title to the property of the trust, the organization is treated as a business trust. If, however, the trustees are subject to the control of the shareholders, then the trust will be treated as a partnership. *See Hecht v. Malley,* 265 U.S. 144, 146, 44 S.Ct. 462, 463, 68 L.Ed. 949 (1924); *Engineering Serv. Corp. v. Longridge Inv. Co.,* 153 Cal.App.2d 404, 314 P.2d 563 (1957); *see also* 88 A.L.R.3d at 725–26.

This Court was unable to locate decisional law in the District of Columbia that would show how business trusts would be treated in this jurisdiction. The Court will

rely on Massachusetts law since that is the jurisdiction where the Declaration of Trust of Washington 1 is filed.

Plaintiff advances three theories for holding defendant Katz individually liable on the Note:

  1) partnership by admission or estoppel;

  2) piercing the corporate veil; and

  3) failing to disclaim liability in the Note.

The Court will address each of these contentions.

### A. Partnership by Estoppel

■ Plaintiff claims that defendants Curry and Katz held themselves out to be "partners." For this proposition, plaintiff relies on statements made by Curry in referring to Katz as his partner, transcript Vol. II at 131, line 16; a Dun & Bradstreet print-out of C & K Management Trust–Lady Foot, listing Curry and Katz as partners, plaintiff's Ex. 73; and various other similar representations.

Plaintiff's partnership by estoppel theory is based upon D.C.Code Ann. § 41–115 (1981):

> (a) When a person, by words spoken or written or by conduct, represents himself, or consents to another representing him to anyone, as a partner in an existing partnership or with 1 or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership. . . .

*See* Plaintiff's Written Closing Argument at 21 n. 24 (filed March 24, 1989).

Plaintiff argues that it relied on Curry and Katz' representation in consenting to the transaction. The evidence does not support such a conclusion.

While the individual defendants may have referred to each other as partners, the Court cannot take such statements as literal. All of the documents, including the original letter of agreement, are signed by each of the individual defendants as "trustee." All of these documents describe

---

**2.** The only exception is the definition of "organization" found in § 28:1–201 of the Uniform

Commercial Code. The term organization includes a "business trust."

Washington 1 as a "business trust." Even though the Court may accept plaintiff's misconception as to what a Massachusetts business trust is, that fact alone does not allow the Court to conclude that Curry and Katz are therefore partners. Both the officers of Inside Scoop, Mr. Shapiro and Mr. Klein, are attorneys. If they were confused as to the nature of a "business trust," then they should have made inquiries before entering into the agreement. The signatures of Curry and Katz as "trustees" for Washington 1 cannot be construed as anything other than as signatures made in a representative capacity. *See* D.C.Code § 28:3–403 (1981) (signature by authorized representative on negotiable instrument). There is no real evidence that plaintiff relied on any representation of a partnership before it entered into the agreements to assign its lease to Washington 1.

Plaintiff cannot rely on the "control" test either to show that Washington 1 was a partnership. The trustees of Washington 1, Katz and Curry, were not subject to the control of the shareholders. Since the trustees had the exclusive right to manage the business free from the control of shareholders and had sole legal title to the property of the trust, Washington 1 must be treated as a business trust, and not as a partnership. *See Hecht v. Malley*, 265 U.S. 144, 146, 44 S.Ct. 462, 463, 68 L.Ed. 949 (1924).

## B. Piercing the Corporate Veil

■ Plaintiff asks the Court to "pierce the corporate veil" of Washington 1. After extensive research, the Court was unable to locate caselaw that would support such an action against a business trust. While it is arguable that the characteristics of a business trust may lend themselves to a similar analysis, the Court is unwilling to extend the doctrine in this manner. The fact remains that Washington 1 is not a corporation and is not subject to all of the filing requirements and formalities that a corporation must follow. The structure of the trust is also different from a corporation since all of the decisions and responsibilities fall on the shoulders of the trustees.

The trust is not a separate entity like the corporation. The trust is embodied in the trustees.

The Court is disturbed by the irregular manner by which the trustees of Washington 1 conducted business. The Declaration of Trust and governing Massachusetts statute require the trust to file not only with the Secretary of State, but also "with the clerk of every city or town where such ... trust has a usual place of business." Mass.Gen.Laws Ann. ch. 182, § 2 (West 1987). While Washington 1 filed with the Secretary of State in Massachusetts, it never filed anywhere else in Massachusetts or in the District of Columbia. Washington 1 did file its annual reports as required by § 12 of chapter 182. Joint Exs. 24 for 1984, 39 for 1985 & 40 for 1986.

This failure to file, however, does not strip Washington 1 of its business trust status. The only penalty imposed by this failure to file is "a fine of not more than five hundred dollars or by imprisonment for not more than three months." Mass. Gen.Laws Ann. ch. 182, § 2 (West 1987).

Defendant Katz testified at trial that he did not read the 10 or 15 separate Declarations of Trusts of which he was a trustee and had also signed. He stated that he "left that to my lawyers." Transcript Vol. III at 163, line 5. Such disregard for legal duties is appalling. While a business trustee is not subject to many of the fiduciary duties as a conventional trustee, the trustee is responsible to those shareholders that possess a beneficial interest in the trust.

At trial, plaintiff showed other irregularities such as the payment of rent by Washington 1 in the amount of $1,100 for an apartment that was connected with another Steve's store at Dupont Circle. Plaintiff's Ex. 31. There was no evidence that this money was ever repaid to Washington 1. Other checks were issued from the Washington 1 account to the lessor of the Georgetown store in May 1983 for "construction of windows" in the amount of $500, Plaintiff's Ex. 29, and for "June Rent" in the amount of $5,000, Plaintiff's Ex. 26. Another check was issued directly

to the Georgetown store in June 1983 in the amount of $27,089.96. Plaintiff's Ex. 30. The defendant could not offer any explanation for these expenditures, or for the apparent failure to repay.

In March 1984, the Management Trust leased property on K Street from the 1518 K Street Limited Partnership for a Lady Foot retail shoe store. Plaintiff's Ex. 81. A check in the amount of $8,475 was issued from the Washington 1 account to the lessor partnership. Plaintiff's Ex. 32. Defendant Katz could not explain this payment either. There is a whole series of checks from Washington 1 to the Management Trust, totalling thousands of dollars, with either no explanation for what the checks represented or a notation of "loan" or "due to/from Mgt." *See, e.g.*, Plaintiff's Exs. 36–40, 45, 49–50, 56–58, 104/29, 104/31–38 & 119. Defendant did not offer the books from these trusts in order to explain these highly questionable payments or any other explanation.

Other large amounts were paid from Washington 1 to other C & K Investment Trusts, ranging from $3,000 to $35,000. *See* Plaintiff's Exs. 104/02, /16, /17, & 115–117.

Such practice by the trustees of Washington 1 is deplorable, but the Court is unwilling to "pierce the trust," so to speak, when plaintiff failed to ascertain the exact nature of the Massachusetts business trust before entering into the agreements with Washington 1. Plaintiff was on notice that the trustees signed the Note in a representative capacity and did not request or require a personal guarantee by either trustee. Knowing as little as it did about the entity of Washington 1 or the Management Trust, plaintiff in essence assumed the risk when it entered into the agreements with Washington 1 and signed the Note. While Washington 1's actions are inexcusable, the Court is unable to find defendant Katz personally liable for the debts of Washington 1.

As a final note, plaintiff sought to introduce the deposition of Jane Philbin, bookkeeper for the Management Trust, at trial. The difficulty involved with the admission of this deposition is the fact that defendant did not have the opportunity to cross-examine the witness at the deposition and the witness declined to appear during trial since she has an action pending against defendant.

The questions and objections raised concerning this deposition illustrate the problems experienced during the entire discovery period of this action. Discovery was slowed by the mutual lack of cooperation by both parties. Parties and counsel squabbled like children while trying to schedule depositions. On November 23, 1988, the Court entered an order instructing both parties to comply fully with discovery requests. The following course of events ensued.

On November 28, 1988, plaintiff's counsel contacted defendant's counsel, requesting a list of dates on which several depositions could be scheduled. Defendant did not respond. Another letter was sent by plaintiff, including the same requests, on December 6, 1988. Again, defendant failed to respond. Plaintiff wrote another letter on December 15, 1988, informing defendant that Ms. Philbin's deposition was scheduled for 9:00 a.m., on December 27, 1988, at plaintiff's counsel's home in Newton, Massachusetts, at Ms. Philbin's request. On December 21, 1988, defendant wrote plaintiff to inform him that he was not available on December 27, but was "generally available during the first week in January." Discovery was set to close on January 3, 1989.

Originally, Ms. Philbin indicated that December 27 was the only day she could attend. Due to defense counsel's inability to attend on that date, she agreed to change it to December 28, 1988. Plaintiff informed defendant of this change by letter dated December 22, 1988. During this time, defendant filed a motion for a protective order, seeking to prohibit the deposition on the earlier date of December 27. Due to some error of defendant, this motion was not filed with this Court until January 13, 1989.

Ms. Philbin's deposition took place on December 28, 1988. Defendant's counsel did not attend.

Plaintiff received notice of the motion for a protective order before the deposition took place. While the Court understands plaintiff's frustrations with defendant's dilatory tactics, the Court cannot allow the deposition to be admitted when there has been no opportunity to cross-examine the witness. The Court, however, deplores defendant's counsel's methods of avoiding the deposition. When time was so limited, counsel should have contacted each other by phone. These dueling letters merely served to diminish the time without following the Court's order to comply *fully* with discovery requests. On the other hand, plaintiff's counsel should not have taken the deposition when he had notice of the pending motion for a protective order. As a result, the Court declined to use the Philbin deposition in reaching its findings of fact and conclusions of law.

C. Failure to Disclaim Liability on the Note

■ Plaintiff claims that the Note contains no disclaimer of personal liability on behalf of Curry or Katz. Since there is no disclaimer of personal liability, plaintiff believes that Katz is liable personally for the obligations of the trust on the Note. Plaintiff relies on *Dolben v. Gleason*, 292 Mass. 511, 198 N.E. 762 (1935), for this proposition.

The court in *Dolben* recognized the general rule that a trustee is personally liable in an action on a contract made by the trustee for the benefit of the trust estate when the trustee fails to stipulate that he or she is not personally liable. *Id.* at 513, 198 N.E. at 763. "The mere description in the contract of himself as 'Trustee' is not enough to constitute such a stipulation and does not affect the right of the party with whom he contracts to hold him personally liable." *Id.* (citation omitted). While this may be true as to contracts, the court in *Dolben* was quick to note the difference when dealing with negotiable instruments.

"The effect of the addition by a trustee of words descriptive of his office when signing his name to a negotiable instrument is determined *not* by the common law but by the Negotiable Instruments Act...." *Id.* The Uniform Commercial Code (UCC) controls negotiable instruments, even in Massachusetts, when addressing business trusts. This difference is recognized in *Tebaldi Supply Co. v. Macmillan*, 292 Mass. 384, 198 N.E. 651 (1935), and in the earlier case of *Bowen v. Farley*, 256 Mass. 19, 152 N.E. 69 (1926), where the courts agreed that a signature as "trustee" in a regular contract would be insufficient to disclaim personal liability, but when used in a negotiable instrument, it shows that the signature is made in a representative capacity and is enough to disclaim personal liability.

Effective January 1, 1978, § 14A was added to chapter 203 of the Massachusetts General Laws. It provides in part:

Unless otherwise provided in the contract, a trustee shall not be personally liable on contracts properly entered into in his fiduciary capacity in the course of administration of the trust estate unless he failed to reveal his representative capacity and identify the trust estate in the contract.

A trustee shall be personally liable for obligations arising from ownership or control of property of the trust estate or for torts committed in the course of administration of the trust only if he was personally at fault....

Mass.Gen.Laws Ann. ch. 203, § 14A (West Supp.1989). While the Massachusetts Court of Appeals seemed to indicate that this section would apply to a trustee of a business trust, *Seronick v. Levy*, 26 Mass. App.Ct. 367, 371 & n. 3, 527 N.E.2d 746, 749 & n. 3 (1988), this assumption was called into question in *Apahouser Lock & Sec. Corp. v. Carvelli*, 26 Mass.App.Ct. 385, 528 N.E.2d 133 (1988). In *Apahouser*, the Massachusetts Court of Appeals noted that § 14A "had clipped the wings of *Dolben*." *Id.* 26 Mass.App.Ct. at 386, 528 N.E.2d at 134. However, after examining the legislative history and context of § 14A, the court of appeals concluded that

"from the probate and tax contexts that the scope of § 14A does not encompass the case of trustees who are trustees for themselves in the conduct of business affairs or are trustees of a nominee trust." *Id.* at 388, 528 N.E.2d at 135.

Whether § 14A does or does not apply to business trustees is not determinative of the case before this Court. This Court finds that the signature by defendant Katz on the Note as "Phillip [sic] Katz, Trustee," in conjunction with the disclosure of the maker of the Note as "C & K Investment Trust–Washington 1, a Massachusetts business trust" and the paragraph set forth below in the Note, is enough to show that defendant Katz signed the Note in his representative capacity as trustee and not individually. Under the UCC, even in Massachusetts, such a signature is enough to show no personal liability. The Note also contained the following paragraph which demonstrates the nature of the signature:

> The Trustees of Maker, subscribing below represent that they have full power, authority and legal right to execute and deliver this Note and that the debt hereunder constitutes a valid and binding obligation of *Maker.*

Plaintiff's Ex. 2 at 2 (emphasis added). The Court cannot find defendant Katz personally liable based on these facts and conclusions of law.

### III. *Conclusion*

The Court concludes that plaintiff may not recover the amount due on the Note from defendant Katz personally. There was no evidence that plaintiff relied on any real representation of a partnership before it signed the Note selling the lease to Washington 1. All of the documents referring to this transaction, including the Note, referred to Washington 1 as a Massachusetts business trust and all of the signatures by Washington 1 were made in the representative capacity of trustee.

The Court declines to extend the doctrine of "piercing of the corporate veil" to business trusts. It is unclear how the District of Columbia would treat Massachusetts business trusts as it does not recognize the business trust by statute. To use this doctrine to "pierce the trust" would be to recognize the business trust as a viable business form in this jurisdiction. Even jurisdictions recognizing the business trust have not used this vehicle to find trustees personally liable.

The Court also concludes that defendant Katz was not required to disclaim personal liability in the Note. The trust's identity was disclosed within the Note and defendant Katz signed as trustee. Under the UCC, this is enough to show that defendant Katz signed in a representative capacity and not individually. He was not required to include any further disclaimer.

For these reasons, the Court finds in favor of defendant Katz. An appropriate order is attached.

### ORDER

Upon consideration of the trial held to the Court; the entire record herein; and for the reasons set forth in the accompanying opinion, it is by the Court this 19th day of September 1989,

ORDERED that judgment is entered in defendant Philip M. Katz' favor; it is further

ORDERED that defendant's Crossclaim against defendant Paul F. Curry is dismissed as moot; and it is further

ORDERED that this case is dismissed.